**OMNICARE, INC., Plaintiff Below, Appellant,**

v.

**NCS HEALTHCARE, INC., Jon H. Outcalt, Kevin B. Shaw, Boake A. Sells, Richard L. Osborne, Genesis Health Ventures, Inc., and Geneva Sub, Inc., Defendants Below, Appellee.**

Robert M. Miles, Guillerma Marti, Anthony Noble, Jeffrey Treadway, Tillie Saltzman, Dolphin Limited Partnership I, L.P., Ramesh Mehan, Renee Mehan, Renee Mehan Ira, Saroj Mehan, Maneesh Mehan, Rahul Mehan, Joel Mehan, Lajia Mehan, Darshan Mehan Ira, Danshal Mehan (Rollover Ira), Arsh N. Mehan, Arsh N. Mehan (Roth Ira), Ashok K. Mehan, and Ashok K. Mehan Ira, Plaintiffs Below, Appellants,

v.

Jon H. Outcalt, Kevin E. Shaw, Boake A. Sells, Richard L. Osborne, Genesis Health Ventures, Inc., Genesis Sub, Inc., and NCS Healthcare, Inc., Defendants Below, Appellees.

**Nos. 605, 2002, 649, 2002.**

Supreme Court of Delaware.

Submitted: Dec. 10, 2002.
Decided: April 4, 2003.

---

46. 11 *Del. C.* § 4209(g)(2)(b).

47. 11 *Del. C.* § 4209(e)(2).

48. *Id.*

49. *State v. Williams,* ID No. 9809018249, at 3 (Del.Super.Ct.2001).

50. 11 *Del. C.* § 4209(e).

Donald J. Wolfe, Jr. (argued), Kevin R. Shannon, Michael A. Pittenger, John M. Seaman, Richard L. Renck, of Potter, Anderson & Corroon, LLP, Wilmington, Robert C. Myers, Seth C. Farber, James P. Smith III, David F. Owens, Melanie R. Moss, of Dewey Ballantine, LLP, New York City, for appellant.

Edward P. Welch (argued), Edward B. Micheletti, Katherine J. Neikirk, James A. Whitney, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, Mark A. Phillips, of Benesch, Friedlander, Coplan & Aronoff, Cleveland, OH, for appellees, NCS HealthCare, Inc., Boake A. Sells and Richard L. Osborne.

David C. McBride (argued), Bruce L. Silverstein, Christian Douglas Wright, Adam W. Poff, of Young, Conaway, Stargatt & Taylor, Wilmington, Paul Vizcarrondo, Jr., Theodore N. Mirvis (argued), Mark Gordon, John F. Lynch, Lauryn P. Gouldin, of Wachtell, Lipton, Rosen & Katz, New York City, for Genesis Health Ventures, Inc. and Geneva Sub, Inc.

Edward M. McNally, Michael A. Weidinger, Elizabeth A. Brown, of Morris, James, Hitchens & Williams, Wilmington, Timothy G. Warner, and James R. Bright, of Spieth, Bell, McCurdy & Newell Co., Cleveland, OH, for defendant, Kevin B. Shaw.

Jon E. Abramczyk, Brian J. McTear, of Morris, Nichols, Arsht & Tunnell, Wilmington, Frances Floriano Goins, and Thomas G. Kovach, of Squire, Sanders & Dempsey, Cleveland, OH, for defendant, Jon H. Outcalt.

Joseph A. Rosenthal (argued), Carmella P. Keener, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Daniel A. Osborn of Beatie and Osborn, LLP, New York City and Richard B. Bemporad, Lowey, Dannenberg, Bemporad & Selinger, LLP, White Plains, NY, for plaintiffs.

Robert J. Kriner, Jr., of Chimicles & Tikellis, LLP, Wilmington, liaison counsel for plaintiffs.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER and STEELE, Justices, constituting the Court en Banc.

HOLLAND, Justice, for the majority:

NCS Healthcare, Inc. ("NCS"), a Delaware corporation, was the object of competing acquisition bids, one by Genesis Health Ventures, Inc. ("Genesis"), a Pennsylvania corporation, and the other by Omnicare, Inc. ("Omnicare"), a Delaware corporation. The proceedings before this Court were expedited due to exigent circumstances, including the pendency of the stockholders' meeting to consider the NCS/Genesis merger agreement. The determinations of this Court were set forth in a summary manner following oral argument to provide clarity and certainty to the parties going forward. Those determinations are explicated in this opinion.

### Overview of Opinion

The board of directors of NCS, an insolvent publicly traded Delaware corporation, agreed to the terms of a merger with Genesis. Pursuant to that agreement, all of the NCS creditors would be paid in full and the corporation's stockholders would exchange their shares for the shares of Genesis, a publicly traded Pennsylvania corporation. Several months after approving the merger agreement, but before the stockholder vote was scheduled, the NCS board of directors withdrew its prior recommendation in favor of the Genesis merger.

In fact, the NCS board recommended that the stockholders reject the Genesis transaction after deciding that a competing proposal from Omnicare was a superior transaction. The competing Omnicare bid offered the NCS stockholders an amount of cash equal to more than twice the then current market value of the shares to be received in the Genesis merger. The transaction offered by Omnicare also treated the NCS corporation's other stakeholders on equal terms with the Genesis agreement.

The merger agreement between Genesis and NCS contained a provision authorized by Section 251(c) of Delaware's corporation law. It required that the Genesis agreement be placed before the corporation's stockholders for a vote, even if the NCS board of directors no longer recommended it.[1] At the insistence of Genesis, the NCS board also agreed to omit any effective fiduciary clause from the merger agreement. In connection with the Genesis merger agreement, two stockholders of NCS, who held a majority of the voting power, agreed unconditionally to vote all of their shares in favor of the Genesis merger. Thus, the combined terms of the voting agreements and merger agreement guaranteed, *ab initio*, that the transaction proposed by Genesis would obtain NCS stockholder's approval.

The Court of Chancery ruled that the voting agreements, when coupled with the provision in the Genesis merger agreement requiring that it be presented to the stockholders for a vote pursuant to 8 *Del. C.* § 251(c), constituted defensive measures within the meaning of *Unocal Corp. v. Mesa Petroleum Co.*[2] After applying the *Unocal* standard of enhanced judicial scrutiny, the Court of Chancery held that those defensive measures were reasonable. We have concluded that, in the absence of an effective fiduciary out clause, those defensive measures are both preclusive and coercive. Therefore, we hold that those defensive measures are invalid and unenforceable.

### The Parties

The defendant, NCS, is a Delaware corporation headquartered in Beachwood, Ohio. NCS is a leading independent provider of pharmacy services to long-term care institutions including skilled nursing facilities, assisted living facilities and other institutional healthcare facilities. NCS common stock consists of Class A shares and Class B shares. The Class B shares are entitled to ten votes per share and the Class A shares are entitled to one vote per share. The shares are virtually identical in every other respect.

The defendant Jon H. Outcalt is Chairman of the NCS board of directors. Outcalt owns 202,063 shares of NCS Class A common stock and 3,476,086 shares of Class B common stock. The defendant

---

1. Del.Code Ann. tit. 8, § 251(c).

2. *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del.1985). *See also Unitrin, Inc. v.* *Am. Gen. Corp.*, 651 A.2d 1361, 1386–89 (Del. 1995).

Kevin B. Shaw is President, CEO and a director of NCS. At the time the merger agreement at issue in this dispute was executed with Genesis, Shaw owned 28,905 shares of NCS Class A common stock and 1,141,134 shares of Class B common stock.

The NCS board has two other members, defendants Boake A. Sells and Richard L. Osborne. Sells is a graduate of the Harvard Business School. He was Chairman and CEO at Revco Drugstores in Cleveland, Ohio from 1987 to 1992, when he was replaced by new owners. Sells currently sits on the boards of both public and private companies. Osborne is a full-time professor at the Weatherhead School of Management at Case Western Reserve University. He has been at the university for over thirty years. Osborne currently sits on at least seven corporate boards other than NCS.

The defendant Genesis is a Pennsylvania corporation with its principal place of business in Kennett Square, Pennsylvania. It is a leading provider of healthcare and support services to the elderly. The defendant Geneva Sub, Inc., a wholly owned subsidiary of Genesis, is a Delaware corporation formed by Genesis to acquire NCS.

The plaintiffs in the class action own an unspecified number of shares of NCS Class A common stock. They represent a class consisting of all holders of Class A common stock. As of July 28, 2002, NCS had 18,461,599 Class A shares and 5,255,210 Class B shares outstanding.

Omnicare is a Delaware corporation with its principal place of business in Covington, Kentucky. Omnicare is in the institutional pharmacy business, with annual sales in excess of $2.1 billion during its last fiscal year. Omnicare purchased 1000 shares of NCS Class A common stock on July 30, 2002.

## PROCEDURAL BACKGROUND

This is a consolidated appeal from orders of the Court of Chancery in two separate proceedings. One proceeding is brought by Omnicare seeking to invalidate a merger agreement between NCS and Genesis on fiduciary duty grounds. In that proceeding, Omnicare also challenges Voting Agreements between Genesis and Jon H. Outcalt and Kevin B. Shaw, two major NCS stockholders, who collectively own over 65% of the voting power of NCS stock. The Voting Agreements irrevocably commit these stockholders to vote for the merger. The Omnicare action was C.A. No. 19800 in the Court of Chancery and is No. 605, 2002, in this Court.

The other proceeding is a class action brought by NCS stockholders. That action seeks to invalidate the merger primarily on the ground that the directors of NCS violated their fiduciary duty of care in failing to establish an effective process designed to achieve the transaction that would produce the highest value for the NCS stockholders. The stockholder action was C.A. No. 19786 in the Court of Chancery and is No. 649, 2002 in this Court.

### Standing Decision

In Appeal No. 605, 2002 (the "Omnicare appeal") the Court of Chancery entered two orders. The first decision and order (the "Standing Decision"), dated October 25, 2002, dismissed Omnicare's fiduciary duty claims because it lacked standing to assert those claims. The Court of Chancery refused to dismiss Omnicare's declaratory judgment claim, holding that Omnicare had standing, notwithstanding the timing of its purchase of NCS stock to assert its claim, as a bona fide bidder for control, that the NCS charter should be interpreted to cause an automatic conversion of Outcalt's and Shaw's Class B stock

(with ten votes per share) to Class A stock (with one vote per share).

### Voting Agreements Decision

The second decision and order of the Court of Chancery that is before this Court in the Omnicare appeal is the Court of Chancery's order of October 29, 2002 (the "Voting Agreements Decision") adjudicating the merits of the Voting Agreements. With regard to that issue, the Court of Chancery held Omnicare had standing, as set forth in the preceding paragraph. In the Voting Agreements decision on summary judgment, the Court of Chancery interpreted the applicable NCS charter provisions adversely to Omnicare's contention that the irrevocable proxies granted in those agreements by Outcalt and Shaw to vote for the Genesis merger resulted in an automatic conversion of all of Outcalt's and Shaw's Class B stock into Class A stock. Omnicare's claim with respect to the Voting Agreements was, therefore, dismissed by the Court of Chancery.

### Fiduciary Duty Decision

A class action to enjoin the merger was brought by certain stockholders of NCS in the Court of chancery in C.A. No. 19786. The Court of Chancery denied a preliminary injunction in a decision and order dated November 22, 2002, and revised November 25, 2002 (the "Fiduciary Duty Decision"). That decision is now before this Court upon interlocutory review in Appeal No. 649, 2002. The standing of these stockholders to seek injunctive relief based on alleged violations of fiduciary duties by the NCS directors in approving the proposed merger is apparently not challenged by the defendants. Accordingly, the fiduciary duty claims, including those claims Omnicare sought to assert are being asserted by the class action plaintiffs.

### FACTUAL BACKGROUND

The parties are in substantial agreement regarding the operative facts. They disagree, however, about the legal implications. This recitation of facts is taken primarily from the opinion by the Court of Chancery.

### NCS Seeks Restructuring Alternatives

Beginning in late 1999, changes in the timing and level of reimbursements by government and third-party providers adversely affected market conditions in the health care industry. As a result, NCS began to experience greater difficulty in collecting accounts receivables, which led to a precipitous decline in the market value of its stock. NCS common shares that traded above $20 in January 1999 were worth as little as $5 at the end of that year. By early 2001, NCS was in default on approximately $350 million in debt, including $206 million in senior bank debt and $102 million of its 5.¾ % Convertible Subordinated Debentures (the "Notes"). After these defaults, NCS common stock traded in a range of $0.09 to $0.50 per share until days before the announcement of the transaction at issue in this case.

NCS began to explore strategic alternatives that might address the problems it was confronting. As part of this effort, in February 2000, NCS retained UBS Warburg, L.L.C. to identify potential acquirers and possible equity investors. UBS Warburg contacted over fifty different entities to solicit their interest in a variety of transactions with NCS. UBS Warburg had marginal success in its efforts. By October 2000, NCS had only received one nonbinding indication of interest valued at $190 million, substantially less than the face value of NCS's senior debt. This proposal was reduced by 20% after the offeror conducted its due diligence review.

### NCS Financial Deterioration

In December 2000, NCS terminated its relationship with UBS Warburg and retained Brown, Gibbons, Lang & Company as its exclusive financial advisor. During this period, NCS's financial condition continued to deteriorate. In April 2001, NCS received a formal notice of default and acceleration from the trustee for holders of the Notes. As NCS's financial condition worsened, the Noteholders formed a committee to represent their financial interests (the "Ad Hoc Committee"). At about that time, NCS began discussions with various investor groups regarding a restructuring in a "pre-packaged" bankruptcy. NCS did not receive any proposal that it believed provided adequate consideration for its stakeholders. At that time, full recovery for NCS's creditors was a remote prospect, and any recovery for NCS stockholders seemed impossible.

### Omnicare's Initial Negotiations

In the summer of 2001, NCS invited Omnicare, Inc. to begin discussions with Brown Gibbons regarding a possible transaction. On July 20, Joel Gemunder, Omnicare's President and CEO, sent Shaw a written proposal to acquire NCS in a bankruptcy sale under Section 363 of the Bankruptcy Code. This proposal was for $225 million subject to satisfactory completion of due diligence. NCS asked Omnicare to execute a confidentiality agreement so that more detailed discussions could take place.[3]

In August 2001, Omnicare increased its bid to $270 million, but still proposed to structure the deal as an asset sale in bankruptcy. Even at $270 million, Omnicare's proposal was substantially lower than the face value of NCS's outstanding debt. It would have provided only a small recovery for Omnicare's Noteholders and no recovery for its stockholders. In October 2001, NCS sent Glen Pollack of Brown Gibbons to meet with Omnicare's financial advisor, Merrill Lynch, to discuss Omnicare's interest in NCS. Omnicare responded that it was not interested in any transaction other than an asset sale in bankruptcy.

There was no further contact between Omnicare and NCS between November 2001 and January 2002. Instead, Omnicare began secret discussions with Judy K. Mencher, a representative of the Ad Hoc Committee. In these discussions, Omnicare continued to pursue a transaction structured as a sale of assets in bankruptcy. In February 2002, the Ad Hoc Committee notified the NCS board that Omnicare had proposed an asset sale in bankruptcy for $313,750,000.

### NCS Independent Board Committee

In January 2002, Genesis was contacted by members of the Ad Hoc Committee concerning a possible transaction with NCS. Genesis executed NCS's standard confidentiality agreement and began a due diligence review. Genesis had recently emerged from bankruptcy because, like NCS, it was suffering from dwindling government reimbursements.

Genesis previously lost a bidding war to Omnicare in a different transaction. This led to bitter feelings between the principals of both companies. More importantly, this bitter experience for Genesis led to its insistence on exclusivity agreements and lock-ups in any potential transaction with NCS.

---

**3.** Discovery had revealed that, at the same time, Omnicare was attempting to lure away NCS's customers through what it characterized as the "NCS Blitz." The "NCS Blitz" was an effort by Omnicare to target NCS's customers. Omnicare has engaged in an "NCS Blitz" a number of times, most recently while NCS and Omnicare were in discussions in July and August 2001.

### NCS Financial Improvement

NCS's operating performance was improving by early 2002. As NCS's performance improved, the NCS directors began to believe that it might be possible for NCS to enter into a transaction that would provide some recovery for NCS stockholders' equity. In March 2002, NCS decided to form an independent committee of board members who were neither NCS employees nor major NCS stockholders (the "Independent Committee"). The NCS board thought this was necessary because, due to NCS's precarious financial condition, it felt that fiduciary duties were owed to the enterprise as a whole rather than solely to NCS stockholders.

Sells and Osborne were selected as the members of the committee, and given authority to consider and negotiate possible transactions for NCS. The entire four member NCS board, however, retained authority to approve any transaction. The Independent Committee retained the same legal and financial counsel as the NCS board.

The Independent Committee met for the first time on May 14, 2002. At that meeting Pollack suggested that NCS seek a "stalking-horse merger partner" to obtain the highest possible value in any transaction. The Independent Committee agreed with the suggestion.

### Genesis Initial Proposal

Two days later, on May 16, 2002, Scott Berlin of Brown Gibbons, Glen Pollack and Boake Sells met with George Hager, CFO of Genesis, and Michael Walker, who was Genesis's CEO. At that meeting, Genesis made it clear that if it were going to engage in any negotiations with NCS, it would not do so as a "stalking horse." As one of its advisors testified, "We didn't want to be someone who set forth a valuation for NCS which would only result in that valuation . . . being publicly disclosed, and thereby creating an environment where Omnicare felt to maintain its competitive monopolistic positions, that they had to match and exceed that level." Thus, Genesis "wanted a degree of certainty that to the extent [it] w[as] willing to pursue a negotiated merger agreement . . ., [it] would be able to consummate the transaction [it] negotiated and executed."

In June 2002, Genesis proposed a transaction that would take place outside the bankruptcy context. Although it did not provide full recovery for NCS's Noteholders, it provided the possibility that NCS stockholders would be able to recover something for their investment. As discussions continued, the terms proposed by Genesis continued to improve. On June 25, the economic terms of the Genesis proposal included repayment of the NCS senior debt in full, full assumption of trade credit obligations, an exchange offer or direct purchase of the NCS Notes providing NCS Noteholders with a combination of cash and Genesis common stock equal to the par value of the NCS Notes (not including accrued interest), and $20 million in value for the NCS common stock. Structurally, the Genesis proposal continued to include consents from a significant majority of the Noteholders as well as support agreements from stockholders owning a majority of the NCS voting power.

### Genesis Exclusivity Agreement

NCS's financial advisors and legal counsel met again with Genesis and its legal counsel on June 26, 2002, to discuss a number of transaction-related issues. At this meeting, Pollack asked Genesis to increase its offer to NCS stockholders. Genesis agreed to consider this request. Thereafter, Pollack and Hager had further conversations. Genesis agreed to offer a total of $24 million in consideration for the

NCS common stock, or an additional $4 million, in the form of Genesis common stock.

At the June 26 meeting, Genesis's representatives demanded that, before any further negotiations take place, NCS agree to enter into an exclusivity agreement with it. As Hager from Genesis explained it: "[I]f they wished us to continue to try to move this process to a definitive agreement, that they would need to do it on an exclusive basis with us. We were going to, and already had incurred significant expense, but we would incur additional expenses ..., both internal and external, to bring this transaction to a definitive signing. We wanted them to work with us on an exclusive basis for a short period of time to see if we could reach agreement." On June 27, 2002, Genesis's legal counsel delivered a draft form of exclusivity agreement for review and consideration by NCS's legal counsel.

The Independent Committee met on July 3, 2002, to consider the proposed exclusivity agreement. Pollack presented a summary of the terms of a possible Genesis merger, which had continued to improve. The then-current Genesis proposal included (1) repayment of the NCS senior debt in full, (2) payment of par value for the Notes (without accrued interest) in the form of a combination of cash and Genesis stock, (3) payment to NCS stockholders in the form of $24 million in Genesis stock, plus (4) the assumption, because the transaction was to be structured as a merger, of additional liabilities to trade and other unsecured creditors.

NCS director Sells testified, Pollack told the Independent Committee at a July 3, 2002 meeting that Genesis wanted the Exclusivity Agreement to be the first step towards a completely locked up transaction that would preclude a higher bid from Omnicare:

A. [Pollack] explained that Genesis felt that they had suffered at the hands of Omnicare and others. I guess maybe just Omnicare. I don't know much about Genesis [sic] acquisition history. But they had suffered before at the 11:59:59 and that they wanted to have a pretty much bulletproof deal or they were not going to go forward.

Q. When you say they suffered at the hands of Omnicare, what do you mean?

A. Well, my expression is that that was related to—a deal that was related to me or explained to me that they, Genesis, had tried to acquire, I suppose, an institutional pharmacy, I don't remember the name of it. Thought they had a deal and then at the last minute, Omnicare outbid them for the company in a like 11:59 kind of thing, and that they were unhappy about that. And once burned, twice shy.

After NCS executed the exclusivity agreement, Genesis provided NCS with a draft merger agreement, a draft Noteholders' support agreement, and draft voting agreements for Outcalt and Shaw, who together held a majority of the voting power of the NCS common stock. Genesis and NCS negotiated the terms of the merger agreement over the next three weeks. During those negotiations, the Independent Committee and the Ad Hoc Committee persuaded Genesis to improve the terms of its merger.

The parties were still negotiating by July 19, and the exclusivity period was automatically extended to July 26. At that point, NCS and Genesis were close to executing a merger agreement and related voting agreements. Genesis proposed a short extension of the exclusivity agreement so a deal could be finalized. On the morning of July 26, 2002, the Independent Committee authorized an extension of the exclusivity period through July 31.

### Omnicare Proposes Negotiations

By late July 2002, Omnicare came to believe that NCS was negotiating a transaction, possibly with Genesis or another of Omnicare's competitors, that would potentially present a competitive threat to Omnicare. Omnicare also came to believe, in light of a run-up in the price of NCS common stock, that whatever transaction NCS was negotiating probably included a payment for its stock. Thus, the Omnicare board of directors met on the morning of July 26 and, on the recommendation of its management, authorized a proposal to acquire NCS that did not involve a sale of assets in bankruptcy.

On the afternoon of July 26, 2002, Omnicare faxed to NCS a letter outlining a proposed acquisition. The letter suggested a transaction in which Omnicare would retire NCS's senior and subordinated debt at par plus accrued interest, and pay the NCS stockholders $3 cash for their shares. Omnicare's proposal, however, was expressly conditioned on negotiating a merger agreement, obtaining certain third party consents, and completing its due diligence.

Mencher saw the July 26 Omnicare letter and realized that, while its economic terms were attractive, the "due diligence" condition substantially undercut its strength. In an effort to get a better proposal from Omnicare, Mencher telephoned Gemunder and told him that Omnicare was unlikely to succeed in its bid unless it dropped the "due diligence outs." She explained this was the only way a bid at the last minute would be able to succeed. Gemunder considered Mencher's warning "very real," and followed up with his advisors. They, however, insisted that he retain the due diligence condition "to protect [him] from doing something foolish." Taking this advice to heart, Gemunder decided not to drop the due diligence condition.

Late in the afternoon of July 26, 2002, NCS representatives received voicemail messages from Omnicare asking to discuss the letter. The exclusivity agreement prevented NCS from returning those calls. In relevant part, that agreement precluded NCS from "engag[ing] or particpat[ing] in any discussions or negotiations with respect to a Competing Transaction or a proposal for one." The July 26 letter from Omnicare met the definition of a "Competing Transaction."

Despite the exclusivity agreement, the Independent Committee met to consider a response to Omnicare. It concluded that discussions with Omnicare about its July 26 letter presented an unacceptable risk that Genesis would abandon merger discussions. The Independent Committee believed that, given Omnicare's past bankruptcy proposals and unwillingness to consider a merger, as well as its decision to negotiate exclusively with the Ad Hoc Committee, the risk of losing the Genesis proposal was too substantial. Nevertheless, the Independent Committee instructed Pollack to use Omnicare's letter to negotiate for improved terms with Genesis.

### Genesis Merger Agreement And Voting Agreements

Genesis responded to the NCS request to improve its offer as a result of the Omnicare fax the next day. On July 27, Genesis proposed substantially improved terms. First, it proposed to retire the Notes in accordance with the terms of the indenture, thus eliminating the need for Noteholders to consent to the transaction. This change involved paying all accrued interest plus a small redemption premium. Second, Genesis increased the exchange ratio for NCS common stock to one-tenth of a Genesis common share for each NCS common share, an 80% increase. Third, it agreed to lower the proposed termination

fee in the merger agreement from $10 million to $6 million. In return for these concessions, Genesis stipulated that the transaction had to be approved by midnight the next day, July 28, or else Genesis would terminate discussions and withdraw its offer.

The Independent Committee and the NCS board both scheduled meetings for July 28. The committee met first. Although that meeting lasted less than an hour, the Court of Chancery determined the minutes reflect that the directors were fully informed of all material facts relating to the proposed transaction. After concluding that Genesis was sincere in establishing the midnight deadline, the committee voted unanimously to recommend the transaction to the full board.

The full board met thereafter. After receiving similar reports and advice from its legal and financial advisors, the board concluded that "balancing the potential loss of the Genesis deal against the uncertainty of Omnicare's letter, results in the conclusion that the only reasonable alternative for the Board of Directors is to approve the Genesis transaction." The board first voted to authorize the voting agreements with Outcalt and Shaw, for purposes of Section 203 of the Delaware General Corporation Law ("DGCL"). The board was advised by its legal counsel that "under the terms of the merger agreement and because NCS shareholders representing in excess of 50% of the outstanding voting power would be *required* by Genesis to enter into stockholder voting agreements contemporaneously with the signing of the merger agreement, and would agree to vote their shares in favor of the merger agreement, shareholder approval of the merger would be assured even if the NCS Board were to withdraw or change its recommendation. *These facts would prevent NCS from engaging in any alterna-*

*tive or superior transaction in the future."* (emphasis added).

After listening to a *summary* of the merger terms, the board then resolved that the merger agreement and the transactions contemplated thereby were advisable and fair and in the best interests of all the NCS stakeholders. The NCS board further resolved to recommend the transactions to the stockholders for their approval and adoption. A definitive merger agreement between NCS and Genesis and the stockholder voting agreements were executed later that day. The Court of Chancery held that it was not a *per se* breach of fiduciary duty that the NCS board never read the NCS/Genesis merger agreement word for word.[4]

### *NCS/Genesis Merger Agreement*

Among other things, the NCS/Genesis merger agreement provided the following:

- NCS stockholders would receive 1 share of Genesis common stock in exchange for every 10 shares of NCS common stock held;
- NCS stockholders could exercise appraisal rights under *8 Del. C. § 262;*
- NCS would redeem NCS's Notes in accordance with their terms;
- NCS would submit the merger agreement to NCS stockholders regardless of whether the NCS board continued to recommend the merger;
- NCS would not enter into discussions with third parties concerning an alternative acquisition of NCS, or provide nonpublic information to such parties, unless (1) the third party provided an unsolicited, *bona fide* written proposal documenting the terms of the acquisition; (2) the NCS board believed in good faith that the proposal was or was likely to result in an acquisition on terms superi-

---

4. *See, e.g., Smith v. Van Gorkom,* 488 A.2d 858, 883 n. 25 (Del.1985).

or to those contemplated by the NCS/Genesis merger agreement; and (3) before providing non-public information to that third party, the third party would execute a confidentiality agreement at least as restrictive as the one in place between NCS and Genesis; and

• If the merger agreement were to be terminated, under certain circumstances NCS would be required to pay Genesis a $6 million termination fee and/or Genesis's documented expenses, up to $5 million.

### Voting Agreements

Outcalt and Shaw, in their capacity as NCS stockholders, entered into voting agreements with Genesis. NCS was also required to be a party to the voting agreements by Genesis. Those agreements provided, among other things, that:

• Outcalt and Shaw were acting in their capacity as NCS stockholders in executing the agreements, not in their capacity as NCS directors or officers;

• Neither Outcalt nor Shaw would transfer their shares prior to the stockholder vote on the merger agreement;

• Outcalt and Shaw agreed to vote all of their shares in favor of the merger agreement; and

• Outcalt and Shaw granted to Genesis an irrevocable proxy to vote their shares in favor of the merger agreement.

• The voting agreement was specifically enforceable by Genesis.

The merger agreement further provided that if either Outcalt or Shaw breached the terms of the voting agreements, Genesis would be entitled to terminate the merger agreement and potentially receive a $6 million termination fee from NCS. Such a breach was impossible since Section 6 provided that the voting agreements were specifically enforceable by Genesis.

### Omnicare's Superior Proposal

On July 29, 2002, hours after the NCS/Genesis transaction was executed, Omnicare faxed a letter to NCS restating its conditional proposal and attaching a draft merger agreement. Later that morning, Omnicare issued a press release publicly disclosing the proposal.

On August 1, 2002, Omnicare filed a lawsuit attempting to enjoin the NCS/Genesis merger, and announced that it intended to launch a tender offer for NCS's shares at a price of $3.50 per share. On August 8, 2002, Omnicare began its tender offer. By letter dated that same day, Omnicare expressed a desire to discuss the terms of the offer with NCS. Omnicare's letter continued to condition its proposal on satisfactory completion of a due diligence investigation of NCS.

On August 8, 2002, and again on August 19, 2002, the NCS Independent Committee and full board of directors met separately to consider the Omnicare tender offer in light of the Genesis merger agreement. NCS's outside legal counsel and NCS's financial advisor attended both meetings. The board was unable to determine that Omnicare's expressions of interest were likely to lead to a "Superior Proposal," as the term was defined in the NCS/Genesis merger agreement. On September 10, 2002, NCS requested and received a waiver from Genesis allowing NCS to enter into discussions with Omnicare without first having to determine that Omnicare's proposal was a "Superior Proposal."

On October 6, 2002, Omnicare irrevocably committed itself to a transaction with NCS. Pursuant to the terms of its proposal, Omnicare agreed to acquire all the outstanding NCS Class A and Class B shares at a price of $3.50 per share in cash. As a result of this irrevocable offer, on October 21, 2002, the NCS board withdrew its recommendation that the stockholders vote in favor of the NCS/Genesis merger agree-

ment. NCS's financial advisor withdrew its fairness opinion of the NCS/Genesis merger agreement as well.

### Genesis Rejection Impossible

The Genesis merger agreement permits the NCS directors to furnish non-public information to, or enter into discussions with, "any Person in connection with an unsolicited bona fide written Acquisition Proposal by such person" that the board deems likely to constitute a "Superior Proposal." That provision has absolutely no effect on the Genesis merger agreement. Even if the NCS board "changes, withdraws or modifies" its recommendation, as it did, it must still submit the merger to a stockholder vote.

A subsequent filing with the Securities and Exchange Commission ("SEC") states: "the NCS independent committee and the NCS board of directors have determined to withdraw their recommendations of the Genesis merger agreement and recommend that the NCS stockholders vote against the approval and adoption of the Genesis merger." In that same SEC filing, however, the NCS board explained why the success of the Genesis merger had already been predetermined. "Notwithstanding the foregoing, the NCS independent committee and the NCS board of directors recognize that (1) the existing contractual obligations to Genesis currently prevent NCS from accepting the Omnicare irrevocable merger proposal; and (2) the existence of the voting agreements entered into by Messrs. Outcalt and Shaw,

whereby Messrs. Outcalt and Shaw agreed to vote their shares of NCS Class A common stock and NCS Class B common stock in favor of the Genesis merger, ensure NCS stockholder approval of the Genesis merger." This litigation was commenced to prevent the consummation of the inferior Genesis transaction.

## LEGAL ANALYSIS

### Business Judgment or Enhanced Scrutiny

The "defining tension" in corporate governance today has been characterized as "the tension between deference to directors' decisions and the scope of judicial review."[5] The appropriate standard of judicial review is dispositive of which party has the burden of proof as any litigation proceeds from stage to stage until there is a substantive determination on the merits.[6] Accordingly, identification of the correct analytical framework is essential to a proper judicial review of challenges to the decision-making process of a corporation's board of directors.[7]

 "The business judgment rule, as a standard of judicial review, is a common-law recognition of the statutory authority to manage a corporation that is vested in the board of directors."[8] The business judgment rule is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[9] "An application of the

---

5. E. Norman Veasey, *The Defining Tension in Corporate Governance in America*, 52 Bus. Law. 393, 403 (1997).

6. *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1371 (Del.1995). *See, e.g., Malpiede v. Townson*, 780 A.2d 1075 (Del.2001); *Emerald Partners v. Berlin*, 787 A.2d 85 (Del.2001); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156 (Del.1995); *Kahn v. Lynch Communications Sys., Inc.*, 638 A.2d 1110 (1994).

7. *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d at 1374.

8. *MM Companies v. Liquid Audio, Inc.*, 813 A.2d 1118, 1127 (Del.2003).

9. *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d at 1373 (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984)).

traditional business judgment rule places the burden on the 'party challenging the [board's] decision to establish facts rebutting the presumption.'"[10] The effect of a proper invocation of the business judgment rule, as a standard of judicial review, is powerful because it operates deferentially. Unless the procedural presumption of the business judgment rule is rebutted, a "court will not substitute its judgment for that of the board if the [board's] decision can be 'attributed to any rational business purpose.'"[11]

■ The business judgment rule embodies the deference that is accorded to managerial decisions of a board of directors. "Under normal circumstances, neither the courts nor the stockholders should interfere with the managerial decision of the directors."[12] There are certain circumstances, however, "which mandate that a court take a more direct and active role in overseeing the decisions made and actions taken by directors. In these situations, a court subjects the directors' conduct to enhanced scrutiny to ensure that it is reasonable,"[13] "before the protections of the business judgment rule may be conferred."[14]

The prior decisions of this Court have identified the circumstances where board action must be subjected to enhanced judicial scrutiny before the presumptive protection of the business judgment rule can be invoked. One of those circumstances was described in *Unocal:* when a board adopts defensive measures in response to a hostile takeover proposal that the board reasonably determines is a threat to corporate policy and effectiveness.[15] In *Moran v. Household,* we explained why a *Unocal* analysis also was applied to the adoption of a stockholder's rights plan, even in the absence of an immediate threat.[16] Other circumstances requiring enhanced judicial scrutiny give rise to what are known as *Revlon* duties, such as when the board enters into a merger transaction that will cause a change in corporate control, initiates an active bidding process seeking to sell the corporation, or makes a break up of the corporate entity inevitable.[17]

### Merger Decision Review Standard

■ The first issue decided by the Court of Chancery addressed the standard of judicial review that should be applied to the decision by the NCS board to merge with Genesis. This Court has held that a board's decision to enter into a merger transaction that does not involve a change in control is entitled to judicial deference pursuant to the procedural and substantive operation of the business judgment rule.[18] When a board decides to enter into a merger transaction that will result in a change of control, however, enhanced judicial scrutiny under *Revlon* is the standard of review.[19]

10. *Id.*

11. *Id.* at 1373 (quoting *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 954 (Del.1985) (citation omitted)).

12. *Paramount Communications Inc. v. QVC Network Inc.,* 637 A.2d 34, 42 (Del.1993).

13. *Id.* (footnote omitted).

14. *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d at 954.

15. *Id.* at 954–55.

16. *Moran v. Household Int'l, Inc.,* 500 A.2d 1346, 1356 (Del.1985).

17. *Paramount Communications Inc. v. QVC Network Inc.,* 637 A.2d at 47; *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 182 (Del.1986).

18. *Paramount Communications, Inc. v. Time Inc.,* 571 A.2d 1140, 1152 (Del.1989).

19. *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 182 (Del.1986).

The Court of Chancery concluded that, because the stock-for-stock merger between Genesis and NCS did not result in a change of control, the NCS directors' duties under *Revlon* were not triggered by the decision to merge with Genesis.[20] The Court of Chancery also recognized, however, that *Revlon* duties are imposed "when a corporation initiates an active bidding process seeking to sell itself."[21] The Court of Chancery then concluded, alternatively, that *Revlon* duties had not been triggered because NCS did not start an active bidding process, and the NCS board "abandoned" its efforts to sell the company when it entered into an exclusivity agreement with Genesis.

After concluding that the *Revlon* standard of enhanced judicial review was completely inapplicable, the Court of Chancery then held that it would examine the decision of the NCS board of directors to approve the Genesis merger pursuant to the business judgment rule standard. After completing its business judgment rule review, the Court of Chancery held that the NCS board of directors had not breached their duty of care by entering into the exclusivity and merger agreements with Genesis. The Court of Chancery also held, however, that "even applying the more exacting *Revlon* standard, the directors acted in conformity with their fiduciary duties in seeking to achieve the highest and best transaction that was reasonably available to [the stockholders]."[22]

The appellants argue that the Court of Chancery's *Revlon* conclusions are without factual support in the record and contrary to Delaware law for at least two reasons. First, they submit that NCS did initiate an active bidding process. Second, they submit that NCS did not "abandon" its efforts to sell itself by entering into the exclusivity agreement with Genesis. The appellants contend that once NCS decided "to initiate a bidding process seeking to maximize short-term stockholder value, it cannot avoid enhanced judicial scrutiny under *Revlon* simply because the bidder it selected [Genesis] happens to have proposed a merger transaction that does not involve a change of control."

The Court of Chancery's decision to review the NCS board's decision to merge with Genesis under the business judgment rule rather than the enhanced scrutiny standard of *Revlon* is not outcome determinative for the purposes of deciding this appeal. We have assumed arguendo that the business judgment rule applied to the decision by the NCS board to merge with Genesis.[23] We have also assumed arguendo that the NCS board exercised due care when it: abandoned the Independent Committee's recommendation to pursue a stalking horse strategy, without even trying to implement it; executed an exclusivity agreement with Genesis; acceded to Genesis' twenty-four hour ultimatum for making a final merger decision; and executed a merger agreement that was summarized but never completely read by the NCS board of directors.[24]

---

**20.** *See id.*

**21.** *Arnold v. Soc'y for Sav. Bancorp, Inc.,* 650 A.2d 1270, 1290 (Del.1994) (quoting *Paramount Communications, Inc. v. Time Inc.,* 571 A.2d 1140, 1150 (Del.1989)); *see also Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d at 1287; *McMullin v. Beran,* 765 A.2d 910, 919–20 (Del.2000) (finding *Revlon* duties were implicated where the board agreed to sell the entire company, even though the merger did not involve a "change of control").

**22.** *In re NCS Healthcare, Inc.,* 2002 WL 31720732, at \*16 (Del.Ch. Nov.22, 2002). *See Paramount Communications Inc. v. QVC Network Inc.,* 637 A.2d 34, 43 (Del.1993).

**23.** *Paramount Communications, Inc. v. Time Inc.,* 571 A.2d 1140, 1152 (Del.1989).

**24.** *But see Smith v. Van Gorkom,* 488 A.2d 858 (Del.1985).

### Deal Protection Devices Require Enhanced Scrutiny

■ The dispositive issues in this appeal involve the defensive devices that protected the Genesis merger agreement. The Delaware corporation statute provides that the board's management decision to enter into and recommend a merger transaction can become final only when ownership action is taken by a vote of the stockholders. Thus, the Delaware corporation law expressly provides for a balance of power between boards and stockholders which makes merger transactions a shared enterprise and ownership decision. Consequently, a board of directors' decision to adopt defensive devices to protect a merger agreement may implicate the stockholders' right to effectively vote contrary to the initial recommendation of the board in favor of the transaction.[25]

■ It is well established that conflicts of interest arise when a board of directors acts to prevent stockholders from effectively exercising their right to vote contrary to the will of the board.[26] The "omnipresent specter" of such conflict may be present whenever a board adopts defensive devices to protect a merger agreement.[27] The stockholders' ability to effectively reject a merger agreement is likely to bear an inversely proportionate relationship to the structural and economic devices that the board has approved to protect the transaction.

In *Paramount v. Time*, the original merger agreement between Time and Warner did not constitute a "change of control."[28] The plaintiffs in *Paramount v. Time* argued that, although the original Time and Warner merger agreement did not involve a change of control, the use of a lock-up, no-shop clause, and "dry-up" provisions violated the Time board's *Revlon* duties. This Court held that "[t]he adoption of structural safety devices alone does not trigger *Revlon*. Rather, as the Chancellor stated, *such devices are properly subject to a Unocal analysis.*"[29]

In footnote 15 of *Paramount v. Time*, we stated that legality of the structural safety devices adopted to protect the original merger agreement between Time and Warner were not a central issue on appeal.[30] That is because the issue on appeal involved the "Time's board [decision] to recast its consolidation with Warner into an outright cash and securities acquisition of Warner by Time."[31] Nevertheless, we determined that there was substantial evidence on the record to support the conclusions reached by the Chancellor in applying a *Unocal* analysis to each of the structural devices contained in the original merger agreement between Time and Warner.[32]

There are inherent conflicts between a board's interest in protecting a merger transaction it has approved, the stockholders' statutory right to make the final decision to either approve or not approve a merger, and the board's continuing responsibility to effectively exercise its fiduciary duties at all times after the merger agreement is executed. These competing considerations require a threshold deter-

25. *See MM Companies v. Liquid Audio, Inc.,* 813 A.2d 1118, 1120 (Del.2003).

26. *Id.* at 1129

27. *See Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 954 (Del.1985).

28. *Paramount Communications, Inc. v. Time Inc.,* 571 A.2d at 1150.

29. *Id.* at 1151 (footnote omitted) (emphasis added).

30. *Id.* at 1151 n. 15.

31. *Id.* at 1148.

32. *Id.* at 1151 n. 15.

mination that board-approved defensive devices protecting a merger transaction are within the limitations of its statutory authority and consistent with the directors' fiduciary duties. Accordingly, in *Paramount v. Time*, we held that the business judgment rule applied to the Time board's original decision to merge with Warner.[33] We further held, however, that defensive devices adopted by the board to protect the original merger transaction must withstand enhanced judicial scrutiny under the *Unocal* standard of review, even when that merger transaction does not result in a change of control.[34]

### Enhanced Scrutiny Generally

In *Paramount v. QVC*, this Court identified the key features of an enhanced judicial scrutiny test. The first feature is a "judicial determination regarding the adequacy of the decisionmaking process employed by the directors, including the information on which the directors based their decision."[35] The second feature is "a judicial examination of the reasonableness of the directors' action in light of the circumstances then existing."[36] We also held that "the directors have the burden of proving that they were adequately informed and acted reasonably."[37]

In *QVC*, we explained that the application of an enhanced judicial scrutiny test involves a judicial "review of the reasonableness of the substantive merits of the board's actions."[38] In applying that standard, we held that "a court should not ignore the complexity of the directors' task" in the context in which action was taken.[39] Accordingly, we concluded that a court applying enhanced judicial scrutiny should not decide whether the directors made a perfect decision but instead should decide whether "the directors' decision was, on balance, within a range of reasonableness."[40]

In *Unitrin*, we explained the *"ratio decidendi* for the 'range of reasonableness' standard"[41] when a court applies enhanced judicial scrutiny to director action pursuant to our holding in *Unocal*.[42] It is a recognition that a board of directors needs "latitude in discharging its fiduciary duties to the corporation and its shareholders when defending against perceived threats."[43] "The concomitant requirement is for judicial restraint."[44] Therefore, if the board of directors' collective defensive responses are not draconian (preclusive or coercive) and are "within a 'range of reasonableness,' a court must not substitute its judgment for the board's [judgment]."[45] The same *ratio decidendi* applies to the "range of reasonableness" when courts apply *Unocal's* enhanced judicial scrutiny standard to defensive devices intended to

**33.** *Id.* at 1152.

**34.** *Id.* at 1151–55; *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del.1985); *see In re Santa Fe Pacific Corp. Shareholder Litigation*, 669 A.2d 59 (Del.1995).

**35.** *Paramount Communications Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 (Del.1993).

**36.** *Id.*

**37.** *Id.*

**38.** *Id.* (footnote omitted).

**39.** *Id.*

**40.** *Id.* (citations omitted).

**41.** *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d at 1388.

**42.** *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del.1985).

**43.** *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d at 1388.

**44.** *Id.*

**45.** *Id.* (citation omitted); *see also Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d at 949, 954–57.

protect a merger agreement that will not result in a change of control.

A board's decision to protect its decision to enter a merger agreement with defensive devices against uninvited competing transactions that may emerge is analogous to a board's decision to protect against dangers to corporate policy and effectiveness when it adopts defensive measures in a hostile takeover contest. In applying *Unocal's* enhanced judicial scrutiny in assessing a challenge to defensive actions taken by a target corporation's board of directors in a takeover context, this Court held that the board "does not have unbridled discretion to defeat perceived threats by any Draconian means available".[46] Similarly, just as a board's statutory power with regard to a merger decision is not absolute, a board does not have unbridled discretion to defeat any perceived threat to a merger by protecting it with any draconian means available.

Since *Unocal*, "this Court has consistently recognized that defensive measures which are either preclusive or coercive are included within the common law definition of draconian."[47] In applying enhanced judicial scrutiny to defensive actions under *Unocal*, a court must "evaluate the board's overall response, including the justification for each contested defensive measure, and the results achieved thereby."[48] If a "board's defensive actions are inextricably related, the principles of *Unocal* require that such actions be scrutinized collectively as a unitary response to the perceived threat."[49]

Therefore, in applying enhanced judicial scrutiny to defensive devices designed to protect a merger agreement, a court must first determine that those measures are not preclusive or coercive *before* its focus shifts to the "range of reasonableness" in making a proportionality determination.[50] If the trial court determines that the defensive devices protecting a merger are not preclusive or coercive, the proportionality paradigm of *Unocal* is applicable. The board must demonstrate that it has reasonable grounds for believing that a danger to the corporation and its stockholders exists if the merger transaction is not consummated.[51] That burden is satisfied "by showing good faith and reasonable investigation."[52] Such proof is materially enhanced if it is approved by a board comprised of a majority of outside directors or by an independent committee.[53]

When the focus of judicial scrutiny shifts to the range of reasonableness, *Unocal* requires that any defensive devices must be proportionate to the perceived threat to the corporation and its stockholders if the merger transaction is not consummated. Defensive devices taken to protect a merger agreement executed by a board of directors are intended to give that agreement an advantage over any subsequent transactions that materialize before the merger is approved by the stockholders and consummated. This is analogous to the favored treatment that a board of directors may properly give to encourage an initial bidder when it discharges its fiduciary duties under *Revlon*.

**46.** *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d at 955.

**47.** *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d at 1387.

**48.** *Id.*

**49.** *Id.* (citation omitted).

**50.** *Id.* at 1367.

**51.** *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d at 955.

**52.** *Id.* (citation omitted).

**53.** *Id.* (citations omitted).

Therefore, in the context of a merger that does not involve a change of control, when defensive devices in the executed merger agreement are challenged *vis-à-vis* their effect on a subsequent competing alternative merger transaction, this Court's analysis in *Macmillan* is didactic.[54] In the context of a case of defensive measures taken against an existing bidder, we stated in *Macmillan:*

> In the face of disparate treatment, the trial court must first examine whether the directors properly perceived that shareholder interests were enhanced. In any event the board's action must be reasonable in relation to the advantage sought to be achieved [by the merger it approved], or conversely, to the threat which a [competing transaction] poses to stockholder interests. If on the basis of this enhanced *Unocal* scrutiny the trial court is satisfied that the test has been met, then the directors' actions necessarily are entitled to the protections of the business judgment rule.[55]

The latitude a board will have in either maintaining or using the defensive devices it has adopted to protect the merger it approved will vary according to the degree of benefit or detriment to the stockholders' interests that is presented by the value or terms of the subsequent competing transaction.[56]

### Genesis' One Day Ultimatum

The record reflects that two of the four NCS board members, Shaw and Outcalt, were also the *same* two NCS stockholders who combined to control a majority of the stockholder voting power. Genesis gave the four person NCS board less than twenty-four hours to vote in favor of its proposed merger agreement. Genesis insisted the merger agreement include a Section 251(c) clause, mandating its submission for a stockholder vote even if the board's recommendation was withdrawn. Genesis further insisted that the merger agreement omit any effective fiduciary out clause.

Genesis also gave the two stockholder members of the NCS board, Shaw and Outcalt, the same accelerated time table to personally sign the proposed voting agreements. These voting agreements committed them irrevocably to vote their majority power in favor of the merger and further provided in Section 6 that the voting agreements be specifically enforceable. Genesis also required that NCS execute the voting agreements.

Genesis' twenty-four hour ultimatum was that, *unless both* the merger agreement and the voting agreements were signed with the terms it requested, its offer was going to be withdrawn. According to Genesis' attorneys, these "were unalterable conditions to Genesis' willingness to proceed." Genesis insisted on the execution of the interlocking voting rights and merger agreements because it feared that Omnicare would make a superior merger proposal. The NCS board signed the voting rights and merger agreements, without any effective fiduciary out clause, to expressly guarantee that the Genesis merger would be approved, even if a superior merger transaction was presented from Omnicare or any other entity.

### Deal Protection Devices

Defensive devices, as that term is used in this opinion, is a synonym for what are frequently referred to as "deal protection devices." Both terms are used interchangeably to describe any measure or combination of measures that are intended to protect the consummation of a merger

---

**54.** *Mills Acquisition Co. v. Macmillan Inc.,* 559 A.2d 1261, 1288 (Del.1988).

**55.** *Id.* (citation omitted).

**56.** *Id.*

transaction. Defensive devices can be economic, structural, or both.

Deal protection devices need not all be in the merger agreement itself. In this case, for example, the Section 251(c) provision in the merger agreement was combined with the separate voting agreements to provide a structural defense for the Genesis merger agreement against any subsequent superior transaction. Genesis made the NCS board's defense of its transaction absolute by insisting on the omission of any effective fiduciary out clause in the NCS merger agreement.

Genesis argues that stockholder voting agreements cannot be construed as deal protection devices taken by a board of directors because stockholders are entitled to vote in their own interest. Genesis cites *Williams v. Geier*[57] and *Stroud v. Grace*[58] for the proposition that voting agreements are not subject to the *Unocal* standard of review. Neither of those cases, however, holds that the operative effect of a voting agreement must be disregarded *per se* when a *Unocal* analysis is applied to a comprehensive and combined merger defense plan.

In this case, the stockholder voting agreements were inextricably intertwined with the defensive aspects of the Genesis merger agreement. In fact, the voting agreements with Shaw and Outcalt were the linchpin of Genesis' proposed tripartite defense. Therefore, Genesis made the execution of those voting agreements a nonnegotiable condition precedent to its execution of the merger agreement. In the case before us, the Court of Chancery held

that the acts which locked-up the Genesis transaction were the Section 251(c) provision and "the execution of the *voting agreement* by Outcalt and Shaw."

With the assurance that Outcalt and Shaw would irrevocably agree to exercise their majority voting power in favor of its transaction, Genesis insisted that the merger agreement reflect the other two aspects of its concerted defense, i.e., the inclusion of a Section 251(c) provision and the omission of any effective fiduciary out clause. Those dual aspects of the merger agreement would not have provided Genesis with a complete defense in the absence of the voting agreements with Shaw and Outcalt.

### These Deal Protection Devices Unenforceable

■ In this case, the Court of Chancery correctly held that the NCS directors' decision to adopt defensive devices to *completely* "lock up" the Genesis merger mandated "special scrutiny" under the two-part test set forth in *Unocal*.[59] That conclusion is consistent with our holding in *Paramount v. Time* that "safety devices" adopted to protect a transaction that did not result in a change of control are subject to enhanced judicial scrutiny under a *Unocal* analysis.[60] The record does not, however, support the Court of Chancery's conclusion that the defensive devices adopted by the NCS board to protect the Genesis merger were reasonable and proportionate to the threat that NCS perceived from the potential loss of the Genesis transaction.

57. *Williams v. Geier,* 671 A.2d 1368 (Del. 1996).

58. *Stroud v. Grace,* 606 A.2d 75 (Del.1992).

59. *In re NCS Healthcare, Inc.,* 2002 WL 31720732, at *16 (Del.Ch. Nov.22, 2002). *See Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 955 (Del.1985).

60. *See Paramount Communications, Inc. v. Time Inc.,* 571 A.2d 1140, 1151 (Del.1989) (holding that "structural safety devices" in a merger agreement are properly subject to a *Unocal* analysis).

■ Pursuant to the judicial scrutiny required under *Unocal's* two-stage analysis, the NCS directors must first demonstrate "that they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed ...."[61] To satisfy that burden, the NCS directors are required to show they acted in good faith after conducting a reasonable investigation.[62] The threat identified by the NCS board was the possibility of losing the Genesis offer and being left with no comparable alternative transaction.

■ The second stage of the *Unocal* test requires the NCS directors to demonstrate that their defensive response was "reasonable in relation to the threat posed."[63] This inquiry involves a two-step analysis. The NCS directors must first establish that the merger deal protection devices adopted in response to the threat were not "coercive" or "preclusive," and then demonstrate that their response was within a "range of reasonable responses" to the threat perceived.[64] In *Unitrin,* we stated:

- A response is "coercive" if it is aimed at forcing upon stockholders a management-sponsored alternative to a hostile offer.[65]
- A response is "preclusive" if it deprives stockholders of the right to receive all tender offers or precludes a bidder from seeking control by fundamentally restricting proxy contests or otherwise.[66]

This aspect of the *Unocal* standard provides for a disjunctive analysis. If defensive measures are either preclusive or coercive they are draconian and impermissible. In this case, the deal protection devices of the NCS board were *both* preclusive and coercive.

This Court enunciated the standard for determining stockholder coercion in the case of *Williams v. Geier.*[67] A stockholder vote may be nullified by wrongful coercion "where the board or some other party takes actions which have the effect of causing the stockholders to vote in favor of the proposed transaction for some reason other than the merits of that transaction."[68] In *Brazen v. Bell Atlantic Corporation,* we applied that test for stockholder coercion and held "that although the termination fee provision may have influenced the stockholder vote, there were 'no structurally or situationally coercive factors' that made an otherwise valid fee provision impermissibly coercive" under the facts presented.[69]

■ In *Brazen,* we concluded "the determination of whether a particular stockholder vote has been robbed of its effectiveness by impermissible coercion depends on the facts of the case."[70] In this case, the Court of Chancery did not expressly address the issue of "coercion" in its *Unocal* analysis. It did find as a fact, however, that NCS's public stockholders (who owned 80% of NCS and overwhelmingly supported Omnicare's of-

**61.** *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 955 (Del.1985) (citation omitted).

**62.** *Id.*

**63.** *Id.*

**64.** *Unitrin, Inc. v. Am. Gen. Corp.,* 651 A.2d 1361, 1387–88 (Del.1995).

**65.** *Id.* at 1387; *Paramount Communications, Inc. v. Time Inc.,* 571 A.2d at 1154.

**66.** *Id.*

**67.** *Williams v. Geier,* 671 A.2d 1368 (Del. 1996).

**68.** *Id.* at 1382–83 (citations omitted).

**69.** *Brazen v. Bell Atl. Corp.,* 695 A.2d 43, 50 (Del.1997).

**70.** *Brazen v. Bell Atl. Corp.,* 695 A.2d at 50 (quoting *Williams v. Geier,* 671 A.2d at 1383).

fer) will be forced to accept the Genesis merger because of the structural defenses approved by the NCS board. Consequently, the record reflects that any stockholder vote would have been robbed of its effectiveness by the impermissible coercion that predetermined the outcome of the merger without regard to the merits of the Genesis transaction at the time the vote was scheduled to be taken.[71] Deal protection devices that result in such coercion cannot withstand *Unocal's* enhanced judicial scrutiny standard of review because they are not within the range of reasonableness.

Although the minority stockholders were not forced to vote for the Genesis merger, they were required to accept it because it was *a fait accompli*. The record reflects that the defensive devices employed by the NCS board are preclusive and coercive in the sense that they accomplished *a fait accompli*. In this case, despite the fact that the NCS board has withdrawn its recommendation for the Genesis transaction and recommended its rejection by the stockholders, the deal protection devices approved by the NCS board operated in concert to have a preclusive and coercive effect. Those tripartite defensive measures—the Section 251(c) provision, the voting agreements, and the absence of an effective fiduciary out clause—made it "mathematically impossible" and "realistically unattainable" for the Omnicare transaction or any other proposal to suc-

ceed, no matter how superior the proposal.[72]

The deal protection devices adopted by the NCS board were designed to coerce the consummation of the Genesis merger and preclude the consideration of any superior transaction. The NCS directors' defensive devices are not within a reasonable range of responses to the perceived threat of losing the Genesis offer because they are preclusive and coercive.[73] Accordingly, we hold that those deal protection devices are unenforceable.

### Effective Fiduciary Out Required

■ The defensive measures that protected the merger transaction are unenforceable not only because they are preclusive and coercive but, alternatively, they are unenforceable because they are invalid as they operate in this case. Given the specifically enforceable irrevocable voting agreements, the provision in the merger agreement requiring the board to submit the transaction for a stockholder vote and the omission of a fiduciary out clause in the merger agreement completely prevented the board from discharging its fiduciary responsibilities to the minority stockholders when Omnicare presented its superior transaction. "To the extent that a [merger] contract, or a provision thereof, purports to require a board to act or not act in such a fashion as to limit the exercise of fiduciary duties, it is invalid and unenforceable."[74]

---

71. See *Brazen v. Bell Atl. Corp.*, 695 A.2d at 50.

72. See *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d at 1388–89; see also *Carmody v. Toll Bros., Inc.*, 723 A.2d 1180, 1195 (Del.Ch. 1998) (citations omitted).

73. See *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d at 1389.

74. *Paramount Communications Inc. v. QVC Network Inc.*, 637 A.2d 34, 51 (Del.1993) (citation omitted). *Restatement (Second) of Con-

tracts* § 193 explicitly provides that a "promise by a fiduciary to violate his fiduciary duty *or a promise that tends to induce such a violation is unenforceable on grounds of public policy."* The comments to that section indicate that "[d]irectors and other officials of a corporation act in a fiduciary capacity and are subject to the rule stated in this Section." Restatement (Second) of Contracts § 193 (1981) (emphasis added).

In *QVC*,[75] this Court recognized that "[w]hen a majority of a corporation's voting shares are acquired by a single person or entity, or by *a cohesive group acting together* [as in this case], there is a significant diminution in the voting power of those who thereby become minority stockholders."[76] Therefore, we acknowledged that "[i]n the absence of devices protecting the minority stockholders, stockholder votes are likely to become mere formalities," where a cohesive group acting together to exercise majority voting powers have already decided the outcome.[77] Consequently, we concluded that since the minority stockholders lost the power to influence corporate direction through the ballot, "minority stockholders must rely for protection solely on the fiduciary duties owed to them by the directors."[78]

Under the circumstances presented in this case, where a cohesive group of stockholders with majority voting power was irrevocably committed to the merger transaction, "[e]ffective representation of the financial interests of the minority shareholders imposed upon the [NCS board] an affirmative responsibility to protect those minority shareholders' interests."[79] The NCS board could not abdicate its fiduciary duties to the minority by leaving it to the stockholders alone to approve or disapprove the merger agreement because two stockholders had already combined to establish a majority of the voting power that made the outcome of the stockholder vote a foregone conclusion.

The Court of Chancery noted that Section 251(c) of the Delaware General Corporation Law now permits boards to agree to submit a merger agreement for a stockholder vote, even if the Board later withdraws its support for that agreement and recommends that the stockholders reject it.[80] The Court of Chancery also noted that stockholder voting agreements are permitted by Delaware law. In refusing to certify this interlocutory appeal, the Court of Chancery stated "it is simply nonsensical to say that a board of directors abdicates its duties to manage the 'business and affairs' of a corporation under Section 141(a) of the DGCL by agreeing to the inclusion in a merger agreement of a term authorized by § 251(c) of the same statute."

Taking action that is otherwise legally possible, however, does not *ipso facto* comport with the fiduciary responsibilities of directors in all circumstances.[81] The synopsis to the amendments that resulted in the enactment of Section 251(c) in the Delaware corporation law statute specifically provides: "the amendments are not intended to address the question of whether such a submission requirement is appropriate in any particular set of factual circumstances." Section 251 provisions, like the no-shop provision examined in QVC,

---

75. *Paramount Communications Inc. v. QVC Network Inc.*, 637 A.2d 34 (Del.1993).

76. *Id.* at 42 (emphasis added).

77. *Id.* (footnote omitted).

78. *Id.* at 43.

79. *McMullin v. Beran*, 765 A.2d 910, 920 (Del.2000).

80. Section 251(c) was amended in 1998 to allow for the inclusion in a merger agreement of a term requiring that the agreement be put to a vote of stockholders whether or not their directors continue to recommend the transaction. Before this amendment, Section 251 was interpreted as precluding a stockholder vote if the board of directors, after approving the merger agreement but before the stockholder vote, decided no longer to recommend it. *See Smith v. Van Gorkom*, 488 A.2d 858, 887–88 (Del.1985).

81. *MM Companies v. Liquid Audio, Inc.*, 813 A.2d 1118, 1132 (Del.2003) (citation omitted).

are "presumptively valid in the abstract." [82] Such provisions in a merger agreement may not, however, "validly define or limit the directors' fiduciary duties under Delaware law or prevent the [NCS] directors from carrying out their fiduciary duties under Delaware law." [83]

Genesis admits that when the NCS board agreed to its merger conditions, the NCS board was seeking to assure that the NCS creditors were paid in full and that the NCS stockholders received the highest value available for their stock. In fact, Genesis defends its "bulletproof" merger agreement on that basis. We hold that the NCS board did not have authority to accede to the Genesis demand for an absolute "lock-up."

■ The directors of a Delaware corporation have a continuing obligation to discharge their fiduciary responsibilities, as future circumstances develop, after a merger agreement is announced. Genesis anticipated the likelihood of a superior offer after its merger agreement was announced and demanded defensive measures from the NCS board that *completely* protected its transaction.[84] Instead of agreeing to the absolute defense of the Genesis merger from a superior offer, however, the NCS board was required to negotiate a fiduciary out clause to protect the NCS stockholders if the Genesis transaction became an inferior offer. By acceding to Genesis' ultimatum for complete protection *in futuro*, the NCS board disabled itself from exercising its own fiducia-ry obligations at a time when the board's own judgment is most important,[85] i.e. receipt of a subsequent superior offer.

Any board has authority to give the proponent of a recommended merger agreement reasonable structural and economic defenses, incentives, and fair compensation if the transaction is not completed. To the extent that defensive measures are economic and reasonable, they may become an increased cost to the proponent of any subsequent transaction. Just as defensive measures cannot be draconian, however, they cannot limit or circumscribe the directors' fiduciary duties. Notwithstanding the corporation's insolvent condition, the NCS board had no authority to execute a merger agreement that subsequently prevented it from effectively discharging its ongoing fiduciary responsibilities.

■ The stockholders of a Delaware corporation are entitled to rely upon the board to discharge its fiduciary duties at all times.[86] The fiduciary duties of a director are unremitting and must be effectively discharged in the specific context of the actions that are required with regard to the corporation or its stockholders as circumstances change.[87] The stockholders with majority voting power, Shaw and Outcalt, had an absolute right to sell or exchange their shares with a third party at any price. This right was not only known to the other directors of NCS, it became an integral part of the Genesis agreement. In its answering brief, Genesis candidly

---

**82.** *Paramount Communications Inc. v. QVC Network Inc.*, 637 A.2d at 48.

**83.** *Id.*

**84.** The marked improvements in NCS's financial situation during the negotiations with Genesis strongly suggests that the NCS board should have been alert to the prospect of competing offers or, as eventually occurred, a bidding contest.

**85.** *See Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998) (directors' fiduciary duties do not operate intermittently). *See also Moran v. Household Int'l, Inc.*, 500 A.2d 1346 (Del.1985).

**86.** *Malone v. Brincat*, 722 A.2d at 10.

**87.** *Id.; Moran v. Household Int'l, Inc.*, 500 A.2d at 1357 (use of defense evaluated if and when the issue arises).

states that its offer "came with a condition—Genesis would not be a stalking horse and would not agree to a transaction to which NCS's controlling shareholders were not committed."

 The NCS board was required to contract for an effective fiduciary out clause to exercise its continuing fiduciary responsibilities to the minority stockholders.[88] The issues in this appeal do not involve the general validity of either stockholder voting agreements or the authority of directors to insert a Section 251(c) provision in a merger agreement. In this case, the NCS board combined those two otherwise valid actions and caused them to operate in concert as an absolute lock up, in the absence of an effective fiduciary out clause in the Genesis merger agreement.

In the context of this preclusive and coercive lock up case, the protection of Genesis' contractual expectations must yield to the supervening responsibility of the directors to discharge their fiduciary duties on a continuing basis. The merger agreement and voting agreements, as they were combined to operate in concert in this case, are inconsistent with the NCS directors' fiduciary duties. To that extent, we hold that they are invalid and unenforceable.[89]

### Conclusion

With respect to the Fiduciary Duty Decision, the order of the Court of Chancery dated November 22, 2002, denying plaintiffs' application for a preliminary injunc-

tion is reversed. With respect to the Voting Agreements Decision, the order of the Court of Chancery dated October 29, 2002 is reversed to the extent that decision permits the implementation of the Voting Agreements contrary to this Court's ruling on the Fiduciary Duty claims. With respect to the appeal to this Court of that portion of the Standing Decision constituting the order of the Court of Chancery dated October 25, 2002, that granted the motion to dismiss the remainder of the Omnicare complaint, holding that Omnicare lacked standing to assert fiduciary duty claims arising out of the action of the board of directors that preceded the date on which Omnicare acquired its stock, the appeal is dismissed as moot.

The mandate shall issue immediately.

VEASEY, Chief Justice, with whom STEELE, Justice, joins dissenting.

The beauty of the Delaware corporation law, and the reason it has worked so well for stockholders, directors and officers, is that the framework is based on an enabling statute with the Court of Chancery and the Supreme Court applying principles of fiduciary duty in a common law mode on a case-by-case basis. Fiduciary duty cases are inherently fact-intensive and, therefore, unique. This case is unique in two important respects. First, the peculiar facts presented render this case an unlikely candidate for substantial repetition. Second, this is a rare 3–2 split decision of the Supreme Court.[90]

88. *See Paramount Communications Inc. v. QVC Network Inc.,* 637 A.2d at 42–43. Merger agreements involve an ownership decision and, therefore, cannot become final without stockholder approval. Other contracts do not require a fiduciary out clause because they involve business judgments that are within the *exclusive* province of the board of directors' power to manage the affairs of the corporation. *See Grimes v. Donald,* 673 A.2d 1207, 1214–15 (Del.1996).

89. *Paramount Communications, Inc. v. QVC Network, Inc.,* 637 A.2d at 51.

90. Split decisions by this Court, especially in the field of corporation law, are few and far between. One example is our decision in *Smith v. Van Gorkom,* 488 A.2d 858 (Del. 1985), where only three Justices supported reversing the Court of Chancery's decision. As Justice Holland and David Skeel recently noted, while our decisionmaking process fosters consensus, dissenting opinions "illustrate

In the present case, we are faced with a merger agreement and controlling stockholders' commitment that assured stockholder approval of the merger before the emergence of a subsequent transaction offering greater value to the stockholders. This does not adequately summarize the unique facts before us, however. Reference is made to the Vice Chancellor's opinion and the factual summary in the Majority Opinion that adopts the Vice Chancellor's findings.[91]

The process by which this merger agreement came about involved a joint decision by the controlling stockholders and the board of directors to secure what appeared to be the only value-enhancing transaction available for a company on the brink of bankruptcy. The Majority adopts a new rule of law that imposes a prohibition on the NCS board's ability to act in concert with controlling stockholders to lock up this merger. The Majority reaches this conclusion by analyzing the challenged deal protection measures as isolated board actions. The Majority concludes that the board owed a duty to the NCS minority stockholders to refrain from acceding to the Genesis demand for an irrevocable lock-up notwithstanding the compelling circumstances confronting the board and the board's disinterested, informed, good faith exercise of its business judgment.

Because we believe this Court must respect the reasoned judgment of the board of directors and give effect to the wishes of the controlling stockholders, we respectfully disagree with the Majority's reasoning that results in a holding that the confluence of board and stockholder action constitutes a breach of fiduciary duty. The essential fact that must always be re-membered is that this agreement and the voting commitments of Outcalt and Shaw concluded a lengthy search and intense negotiation process in the context of insolvency and creditor pressure where no other viable bid had emerged. Accordingly, we endorse the Vice Chancellor's well-reasoned analysis that the NCS board's action before the hostile bid emerged was within the bounds of its fiduciary duties under these facts.

We share with the Majority and the independent NCS board of directors the motivation to serve carefully and in good faith the best interests of the corporate enterprise and, thereby, the stockholders of NCS. It is now known, of course, after the case is over, that the stockholders of NCS will receive substantially more by tendering their shares into the topping bid of Omnicare than they would have received in the Genesis merger, as a result of the post-agreement Omnicare bid and the injunctive relief ordered by the Majority of this Court. Our jurisprudence cannot, however, be seen as turning on such ex post felicitous results. Rather, the NCS board's good faith decision must be subject to a real-time review of the board action before the NCS–Genesis merger agreement was entered into.

*An Analysis of the Process Leading to the Lock-up Reflects a Quintessential, Disinterested and Informed Board Decision Reached in Good Faith*

The Majority has adopted the Vice Chancellor's findings and has assumed arguendo that the NCS board fulfilled its duties of care, loyalty, and good faith by entering into the Genesis merger agreement. Indeed, this conclusion is indisputa-

---

that principled differences of opinion about the law [are] ... never compromised for the sake of unanimity." Randy J. Holland & David A. Skeel, Jr., *Deciding Cases Without Controversy*, 5 Del. L.Rev. 115, 118 (2002).

**91.** *Majority Opinion* at 920–27.

ble on this record. The problem is that the Majority has removed from their proper context the contractual merger protection provisions. The lock-ups here cannot be reviewed in a vacuum. A court should review the entire bidding process to determine whether the independent board's actions permitted the directors to inform themselves of their available options and whether they acted in good faith.[92]

Going into negotiations with Genesis, the NCS directors knew that, up until that time, NCS had found only one potential bidder, Omnicare. Omnicare had refused to buy NCS except at a fire sale price through an asset sale in bankruptcy. Omnicare's best proposal at that stage would not have paid off all creditors and would have provided nothing for stockholders. The Noteholders, represented by the Ad Hoc Committee, were willing to oblige Omnicare and force NCS into bankruptcy if Omnicare would pay in full the NCS debt. Through the NCS board's efforts, Genesis expressed interest that became increasingly attractive. Negotiations with Genesis led to an offer paying creditors off and conferring on NCS stockholders $24 million—an amount infinitely superior to the prior Omnicare proposals.

But there was, understandably, a sine qua non. In exchange for offering the NCS stockholders a return on their equity and creditor payment, Genesis demanded certainty that the merger would close. If the NCS board would not have acceded to the Section 251(c) provision, if Outcalt and Shaw had not agreed to the voting agreements and if NCS had insisted on a fiduciary out, there would have been no Genesis deal! Thus, the only value-enhancing transaction available would have disappeared. NCS knew that Omnicare had spoiled a Genesis acquisition in the past,[93] and it is not disputed by the Majority that the NCS directors made a reasoned decision to accept as real the Genesis threat to walk away.[94]

When Omnicare submitted its conditional eleventh-hour bid, the NCS board had to weigh the economic terms of the proposal against the uncertainty of completing a deal with Omnicare.[95] Importantly, because Omnicare's bid was conditioned on its satisfactorily completing its due diligence review of NCS, the NCS board saw this as a crippling condition, as did the Ad Hoc Committee. As a matter of business judgment, the risk of negotiating with Omnicare and losing Genesis at that point outweighed the possible benefits.[96] The

92. *See, e.g., Malpiede v. Townson,* 780 A.2d 1075, 1089 (Del.2001) (concluding that the board made an informed decision to refrain from returning to a rival bidder to solicit another offer because the board conducted a "lengthy sale process" that spanned one year).

93. *Majority Opinion* at 923.

94. In *Citron v. Fairchild Camera & Instrument Corp.,* we noted that "whether the constraints are self-imposed or attributable to bargaining tactics of an adversary seeking a final resolution of a belabored process must be considered" in analyzing the target's decision to accept an ultimatum from a bidder. 569 A.2d 53, 67 (Del.1989). Based on Genesis's prior dealings with Omnicare, NCS had good reason to take the Genesis ultimatum seriously.

95. *See Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1282 n. 29 ("In assessing the bid and the bidder's responsibility, a board may consider, among various proper factors ... the risk of nonconsummation...."); *Citron,* 569 A.2d at 68–69 ("We will not hold a target board of predominantly disinterested directors liable for allegedly failing to exhibit due care when the bidder does not provide the target board with a definitive bid.").

96. *See RJR Nabisco, Inc. S'holders Litig.,* 1989 WL 7036 at *19 (Del.Ch.). In *RJR,* the Court of Chancery held that the RJR Nabisco board could justifiably accept the highest bid it received from one bidder, KKR, rather than inquire about a higher offer from the other suitor, the management group, because KKR might have withdrawn its bid. *Id.* at *19.

lock-up was indisputably a sine qua non to any deal with Genesis.

A lock-up permits a target board and a bidder to "exchange certainties."[97] Certainty itself has value. The acquirer may pay a higher price for the target if the acquirer is assured consummation of the transaction. The target company also benefits from the certainty of completing a transaction with a bidder because losing an acquirer creates the perception that a target is damaged goods, thus reducing its value.

This Court approved the recognition by the Court of Chancery of the value of certainty in *Rand v. Western Air Lines*.[98] The Court of Chancery upheld the decision of the board of Western Air Lines to grant its only bidder a stock option agreement to acquire 30% of Western's stock for an amount representing the closing price on the last trading day before execution of the merger agreement.[99] The Court recognized that the lock-up agreement "foreclose[d] further bidding," but noted that the board had canvassed the market, found only one party willing to acquire Western, and made a decision calculated to maximize stockholder value by pursuing "the only viable prospect that remained."[100] The Court also noted that, in return for the lock-up, the acquirer agreed to limit its own "outs" that would prevent consummation of the merger. The merging parties, then, "exchanged certainties" by locking up the deal, which was approved by the Court of Chancery and affirmed by this Court.[101]

While the present case does not involve an attempt to hold on to only one interested bidder, the NCS board was equally concerned about "exchanging certainties" with Genesis. If the creditors decided to force NCS into bankruptcy, which could have happened at any time as NCS was unable to service its obligations, the stockholders would have received nothing. The NCS board also did not know if the NCS business prospects would have declined again, leaving NCS less attractive to other bidders, including Omnicare, which could have changed its mind and again insisted on an asset sale in bankruptcy.

Situations will arise where business realities demand a lock-up so that wealth-enhancing transactions may go forward. Accordingly, any bright-line rule prohibiting lock-ups could, in circumstances such as these, chill otherwise permissible conduct.

### Our Jurisprudence Does Not Compel This Court to Invalidate the Joint Action of the Board and the Controlling Stockholders

The Majority invalidates the NCS board's action by announcing a new rule that represents an extension of our jurisprudence. That new rule can be narrowly stated as follows: A merger agreement entered into after a market search, before any prospect of a topping bid has emerged, which locks up stockholder approval and does not contain a "fiduciary out" provision, is per se invalid when a later significant topping bid emerges. As we have noted, this bright-line, per se rule would apply regardless of (1) the circumstances leading up to the agreement and (2) the fact that stockholders who control voting

**97.** *See Rand v. Western Air Lines,* 1994 WL 89006 at *6 (Del.Ch.).

**98.** 1994 WL 89006 (Del.Ch.) *aff'd* 659 A.2d 228 (Del.1995).

**99.** *Id.* at *3.

**100.** *Id.* at *7.

**101.** *Id.* at *6 ("Western gained a substantial benefit for its stockholders by keeping the only party expressing any interest at the table while achieving its own assurances that the transaction would be consummated.").

power had irrevocably committed themselves, *as stockholders*, to vote for the merger. Narrowly stated, this new rule is a judicially-created "third rail" that now becomes one of the given "rules of the game," to be taken into account by the negotiators and drafters of merger agreements. In our view, this new rule is an unwise extension of existing precedent.

Although it is debatable whether *Unocal* applies—and we believe that the better rule in this situation is that the business judgment rule should apply [102]—we will, nevertheless, assume arguendo—as the Vice Chancellor did—that *Unocal* applies. Therefore, under *Unocal* the NCS directors had the burden of going forward with the evidence to show that there was a threat to corporate policy and effectiveness and that their actions were reasonable in response to that threat. The Vice Chancellor correctly found that they reasonably perceived the threat that NCS did not have a viable offer from Omnicare—or anyone else—to pay off its creditors, cure its insolvency and provide some payment to stockholders. The NCS board's actions—as the Vice Chancellor correctly held—were reasonable in relation to the threat because the Genesis deal was the "only game in town," the NCS directors got the best deal they could from Genesis and—but-for the emergence of Genesis on the scene—there would have been no viable deal.

The Vice Chancellor held that the NCS directors satisfied *Unocal*. He even held that they would have satisfied *Revlon*, if it had applied, which it did not. Indeed, he concluded—based on the undisputed record and his considerable experience—that: "The overall quality of testimony given by the NCS directors is among the strongest this court has ever seen. All four NCS directors were deposed, and each deposition makes manifest the care and attention given to this project by every member of the board." [103] We agree fully with the Vice Chancellor's findings and conclusions, and we would have affirmed the judgment of the Court of Chancery on that basis.

In our view, the Majority misapplies the *Unitrin* concept of "coercive and preclusive" measures to preempt a proper proportionality balancing. Thus, the Majority asserts that "in applying *enhanced judicial scrutiny* to *defensive devices* designed to protect a merger agreement, ... a court must ... determine that those measures are not preclusive or coercive...." [104] Here, the deal protection measures were not adopted unilaterally by the board to fend off an existing hostile offer that

---

**102.** The basis for the *Unocal* doctrine is the "omnipresent specter" of the board's self-interest to entrench itself in office. *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del.1985). NCS was not plagued with a specter of self-interest. Unlike the *Unocal* situation, a hostile offer did not arise here until *after* the market search and the locked-up deal with Genesis.

The *Unocal* doctrine applies to unilateral board actions that are defensive and reactive in nature. Thus, a *Unocal* analysis was necessary in *Paramount Communications v. Time Inc.* because Time and Warner restructured their original transaction from a merger to an acquisition *in response* to the Paramount bid. 571 A.2d 1140, 1148 (Del.1989). In *Time*, the

original Time–Warner stock-for-stock merger, which this Court held was entitled to the presumption of the business judgment rule, was jettisoned by the parties in the face of Paramount's topping bid. *Id.* at 1152. The merger was replaced with a new transaction which was an all cash tender offer by Time to acquire 51% of the Warner stock. It was the revised agreement, not the original merger agreement, that was found to be "defense-motivated" and subject to *Unocal*. *Id.*

**103.** *In re NCS Healthcare, Inc. S'holders Litig.*, 2002 WL 31720732 (Del.Ch.) ("Chancery, Fiduciary Duty Opinion") at \*15 n. 46.

**104.** *Majority Opinion* at 932 (emphasis supplied.).

threatened the corporate policy and effectiveness of NCS.[105] They were adopted because Genesis—the "only game in town"—would not save NCS, its creditors and its stockholders without these provisions.

The Majority—incorrectly, in our view—relies on *Unitrin* to advance its analysis. The discussion of "draconian" measures in *Unitrin* dealt with unilateral board action, a repurchase program, designed to fend off an existing hostile offer by American General.[106] In *Unitrin* we recognized the need to police preclusive and coercive actions initiated *by the board* to delay or retard an existing hostile bid so as to ensure that the stockholders can benefit from the board's negotiations with the bidder or others and to exercise effectively the franchise as the ultimate check on board action.[107] *Unitrin* polices the effect of board action on existing tender offers and proxy contests to ensure that the board cannot permanently impose its will on the stockholders, leaving the stockholders no recourse to their voting rights.[108]

The very measures the Majority cites as "coercive" were approved by Shaw and Outcalt through the lens of their independent assessment of the merits of the transaction. The proper inquiry in this case is whether the NCS board had taken actions that "have the effect of causing the stockholders to vote in favor of the proposed transaction for some reason other than the merits of that transaction."[109] Like the termination fee upheld as a valid liquidated damages clause against a claim of coercion in *Brazen v. Bell Atlantic Corp.*, the deal protection measures at issue here were "an integral part of the merits of the transaction" as the NCS board struggled to secure—and did secure—the only deal available.[110]

Outcalt and Shaw were fully informed stockholders. As the NCS controlling stockholders, they made an informed choice to commit their voting power to the merger. The minority stockholders were deemed to know that when controlling stockholders have 65% of the vote they can approve a merger without the need for the minority votes. Moreover, to the extent a

**105.** The Majority states that our decisions in *Williams v. Geier* and *Stroud v. Grace* do not hold that "the operative effect of a voting agreement must be disregarded *per se* when a *Unocal* analysis is applied to a comprehensive and combined merger defense plan." *Majority Opinion* at 934. In *Stroud v. Grace,* however, we noted that "The record clearly indicates, and [plaintiff] ... concedes, that over 50% of the outstanding shares of ... [the corporation] are under the direct control of [the defendants].... These directors controlled the corporation in fact and law. *This obviates any threat contemplated by Uno-cal.* ..." 606 A.2d 75, 83 (Del.1992) (emphasis supplied). According to *Stroud,* then, Shaw's and Outcalt's decision to enter into the voting agreements should not be subject to a *Unocal* analysis because they controlled the corporation "in fact and law." *Id.* Far from a breach of duty, the joint action of the stockholders and directors here represents "the highest and best form of corporate de-

mocracy." *Williams v. Geier,* 671 A.2d 1368, 1381 (Del.1996).

**106.** *Unitrin, Inc. v. American General Corp.,* 651 A.2d 1361, 1370 (Del.1995).

**107.** *Id.* at 1379 ("We begin our examination of Unitrin's Repurchase Program mindful of the special import of protecting the shareholder's franchise within *Unocal's* requirement that a defensive measure be reasonable and proportionate.") (citation omitted).

**108.** *Id.* at 1383 (upholding the Unitrin board's defensive measures because the board actions "would not appear to have a preclusive effect upon American General's ability successfully to marshal enough shareholder votes to win a proxy contest.").

**109.** *Geier,* 671 A.2d at 1382–83 (citations omitted).

**110.** 695 A.2d 43, 50 (Del.1997).

minority stockholder may have felt "coerced" to vote for the merger, which was already a *fait accompli*, it was a meaningless coercion—or no coercion at all—because the controlling votes, those of Outcalt and Shaw, were already "cast." Although the fact that the controlling votes were committed to the merger "precluded" an overriding vote against the merger by the Class A stockholders, the pejorative "preclusive" label applicable in a *Unitrin* fact situation has no application here. Therefore, there was no meaningful minority stockholder voting decision to coerce.

In applying *Unocal* scrutiny, we believe the Majority incorrectly preempted the proportionality inquiry. In our view, the proportionality inquiry must account for the reality that the contractual measures protecting this merger agreement were necessary to obtain the Genesis deal. The Majority has not demonstrated that the director action was a disproportionate response to the threat posed. Indeed, it is clear to us that the board action to negotiate the best deal reasonably available with the only viable merger partner (Genesis) who could satisfy the creditors and benefit the stockholders, was reasonable in relation to the threat, by any practical yardstick.

### An Absolute Lock-up is Not a Per Se Violation of Fiduciary Duty

We respectfully disagree with the Majority's conclusion that the NCS board breached its fiduciary duties to the Class A stockholders by failing to negotiate a "fiduciary out" in the Genesis merger agreement. What is the practical import of a "fiduciary out?" It is a contractual provision, articulated in a manner to be negotiated, that would permit the board of the corporation being acquired to exit without breaching the merger agreement in the event of a superior offer.

In this case, Genesis made it abundantly clear early on that it was willing to negotiate a deal with NCS but only on the condition that it would not be a "stalking horse." Thus, it wanted to be certain that a third party could not use its deal with NCS as a floor against which to begin a bidding war. As a result of this negotiating position, a "fiduciary out" was not acceptable to Genesis. The Majority Opinion holds that such a negotiating position, if implemented in the agreement, is invalid per se where there is an absolute lock-up. We know of no authority in our jurisprudence supporting this new rule, and we believe it is unwise and unwarranted.

The Majority relies on our decision in *QVC* to assert that the board's fiduciary duties prevent the directors from negotiating a merger agreement without providing an escape provision. Reliance on *QVC* for this proposition, however, confuses our statement of a board's responsibilities when the directors confront a superior transaction and turn away from it to lock up a less valuable deal with the very different situation here, where the board committed itself to the *only* value-enhancing transaction available. The decision in *QVC* is an extension of prior decisions in *Revlon* and *Mills* that prevent a board from ignoring a bidder who is willing to match and exceed the favored bidder's offer.[111] The Majority's application of "continuing fiduciary duties" here is a further extension of this concept and thus permits, wrongly in our view, a court to second-guess the risk and return analysis the board must make to weigh the value of the only viable transaction against the prospect of an offer that has not materialized.

The Majority also mistakenly relies on our decision in *QVC* to support the notion that the NCS board should have retained a fiduciary out to save the minority stock-

---

111. *Paramount Communications v. QVC Net-* *work,* 637 A.2d 34, 49–50 (Del.1993).

holder from Shaw's and Outcalt's voting agreements. Our reasoning in *QVC*, which recognizes that minority stockholders must rely for protection on the fiduciary duties owed to them by directors,[112] does not create a *special* duty to protect the minority stockholders from the consequences of a controlling stockholder's ultimate decision unless the controlling stockholder stands on both sides of the transaction,[113] which is certainly not the case here. Indeed, the discussion of a minority stockholders' lack of voting power in *QVC* notes the importance of enhanced scrutiny in change of control transactions *precisely because* the minority stockholders' interest in the *newly merged entity* thereafter will hinge on the course set by the controlling stockholder.[114] In *QVC*, Sumner Redstone owned 85% of the voting stock of Viacom, the surviving corporation.[115] Unlike the stockholders who are confronted with a transaction that will relegate them to a minority status in the corporation, the Class A stockholders of NCS purchased stock knowing that the Charter provided Class B stockholders voting control.

### Conclusion

It is regrettable that the Court is split in this important case. One hopes that the Majority rule announced here—though clearly erroneous in our view—will be interpreted narrowly and will be seen as *sui generis*.[116] By deterring bidders from engaging in negotiations like those present here and requiring that there must always be a fiduciary out, the universe of potential bidders who could reasonably be expected to benefit stockholders could shrink or disappear. Nevertheless, if the holding is confined to these unique facts, negotiators may be able to navigate around this new hazard.

Accordingly, we respectfully dissent.

STEELE, Justice, dissenting.

I respectfully dissent from the majority opinion, join the Chief Justice's dissent in all respects and dissent separately in order to crystallize the central focus of my objection to the majority view.

I would affirm the Vice Chancellor's holding denying injunctive relief.

Here the board of directors acted selflessly pursuant to a careful, fair process and determined in good faith that the benefits to the stockholders and corporation flowing from a merger agreement containing reasonable deal protection provisions outweigh any speculative benefits that might result from entertaining a putative higher offer. A court asked to examine the decisionmaking process of the board should decline to interfere with the consummation and execution of an otherwise valid contract.

In my view, the Vice Chancellor's unimpeachable factual findings preclude further judicial scrutiny of the NCS board's business judgment that the hotly negotiated terms of its merger agreement were necessary in order to save the company from financial collapse, repay creditors and provide some benefits to NCS stockholders.

A concurring dissent is not a useful mechanism for restating the facts the Vice Chancellor found significant, particularly

---

112. 637 A.2d at 47.

113. *See Bershad v. Curtiss–Wright Corp.*, 535 A.2d 840, 845 (Del.1987) (noting that absent fiduciary duties arising from standing on both sides of a transaction, "stockholders in Delaware corporations have a right to control and vote their shares in their own interest.").

114. *QVC*, 637 A.2d at 47–48.

115. *Id.* at 38.

116. Importantly, we decide only the case before us. *QVC*, 637 A.2d at 51.

when the majority accepts those facts and a highly persuasive, compelling dissent, places them squarely in the correct perspective. What is far less clear to me is how the majority can adopt those facts and then conclude that the NCS board breached any fiduciary duty to NCS' minority stockholders simply by endorsing a voting agreement between the majority stockholders that locked up a carefully negotiated and essential merger agreement with Genesis.

In my opinion, Delaware law mandates deference under the business judgment rule to a board of directors' decision that is free from self interest, made with due care and in good faith.

> Under Delaware law, the business judgment rule is the offspring of the fundamental principle, codified in § 141(a), that the business and affairs of a Delaware corporation are managed by or under its board of directors.... The business judgment rule exists to protect and promote the full and free exercise of the managerial power granted to Delaware directors.[117]

Importantly, *Smith v. Van Gorkom,* correctly casts the focus on any court review of board action challenged for alleged breach of the fiduciary duty of care "only upon the basis of the information then reasonably available to the directors and relevant to their decision...."[118] Though criticized particularly for the imposition of personal liability on directors for a breach of the duty of care, *Van Gorkom* still stands for the importance of recognizing the limited circumstances for court intervention and the importance of focusing on the timing of the decision attacked.

The majority concludes that Unocal's intermediate standard of review compels judicial interference to determine whether contract terms, that the majority refers to at various times as "deal protection devices," "defensive devices," "defensive measures" or "structural safety devices," are preclusive and coercive. The majority's conclusion substantially departs from both a common sense appraisal of the contextual landscape of this case and Delaware case law applying the *Unocal* standard.

In the factual context of this case, the NCS board had thoroughly canvassed the market in an attempt to find an acquirer, save the company, repay creditors and provide some financial benefit to stockholders. They did so in the face of silence, tepid interest to outright hostility from Omnicare. The only *bona fide,* credible merger partner NCS could find during an exhaustive process was Genesis, a company that had experienced less than desirable relations with Omnicare in the past. Small wonder NCS' only viable merger partner made demands *and concessions* to acquire contract terms that enhanced assurance that the merger would close. The NCS board agreed to lock up the merger with contractual protection provisions in order to avoid the prospect of Genesis walking away from the deal leaving NCS in the woefully undesirable position of negotiating with a company that had worked for months against NCS' interests by negotiating with NCS' creditors. Those negotiations suggested no regard for NCS' stockholders' interests, and held out only the hope of structuring a purchase of NCS in a bankruptcy environment.

117. *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del.1985).

118. *Id.* at 874; *see also* R. Franklin Balotti and A. Gilchrist Sparks, III, *Deal–Protection* *Measures and the Merger Recommendation,* 96 Nw. U.L.Rev. 467 (2002) (an article presaging the conflict between appropriate discharge of fiduciary duty and the sanctity of contract provisions fairly negotiated).

The contract terms that NCS' board agreed to included no insidious, camouflaged side deals for the directors or the majority stockholders nor transparent provisions for entrenchment or control premiums. At the time the NCS board and the majority stockholders agreed to a voting lockup, the terms were the best reasonably available for all the stockholders, balanced against a genuine risk of no deal at all. The cost benefit analysis entered into by an independent committee of the board, approved by the full board and independently agreed to by the majority stockholders cannot be second guessed by courts with no business expertise that would qualify them to substitute their judgment for that of a careful, selfless board or for majority stockholders who had the most significant economic stake in the outcome.

We should not encourage proscriptive rules that invalidate or render unenforceable precommitment strategies negotiated between two parties to a contract who will presumably, in the absence of conflicted interest, bargain intensely over every meaningful provision of a contract after a careful cost benefit analysis. Where could this plain common sense approach be more wisely invoked than where a board, free of conflict, fully informed, supported by the equally conflict-free holders of the largest economic interest in the transaction, reaches the conclusion that a voting lockup strategy is the best course to obtain the most benefit for all stockholders?

This fundamental principle of Delaware law so eloquently put in the Chief Justice's dissent, is particularly applicable here where the NCS board had no alternative if the company were to be saved. If attorneys counseling well motivated, careful, and well-advised boards cannot be assured

that their clients' decision—sound at the time but later less economically beneficial only because of post-decision, unforeseeable events—will be respected by the courts, Delaware law, and the courts that expound it, may well be questioned. I would not shame the NCS board, which acted in accordance with every fine instinct that we wish to encourage, by invalidating their action approving the Genesis merger because they failed to insist upon a fiduciary out. I use "shame" here because the majority finds no breach of loyalty or care but nonetheless sanctions these directors for their failure to insist upon a fiduciary out as if those directors had no regard for the effect of their otherwise disinterested, careful decision on others.[119] The majority seeks to deter future boards from similar conduct by declaring that agreements negotiated under similar circumstances will be unenforceable.

Delaware corporate citizens now face the prospect that in *every* circumstance, boards must obtain the highest price, even if that requires breaching a contract entered into at a time when no one could have reasonably foreseen a truly "Superior Proposal." The majority's proscriptive rule limits the scope of a board's cost benefit analysis by taking the bargaining chip of foregoing a fiduciary out "off the table" in all circumstances. For that new principle to arise from the context of this case, when Omnicare, after striving to buy NCS on the cheap by buying off its creditors, slinked back into the fray, reversed its historic antagonistic strategy and offered a conditional "Superior Proposal" seems entirely counterintuitive.

The majority declares that a fairly negotiated exchange of consideration is invalid and unenforceable on the theory that its

---

119. For a more expansive and thoughtful explanation of the concept of "shaming" in the context of corporate law, *see* David A. Skeel, Jr., *Symposium Norms & Corporate Law: Shaming in Corporate Law,* 149 U. Pa. L.Rev. 1811 (2001).

terms preclude minority stockholders from accepting a superior alternative or that it coerces them into accepting an inferior deal while presupposing that the objectionable terms of NCS' agreement with Genesis are "defensive measures."[120] The majority equates those contract provisions with measures affirmatively adopted to prevent a third party bidder from frustrating a deal with an acquirer with which management may choose to deal without being fully informed or for their own self interest. In effect, the majority has adopted the "duck" theory of contract interpretation. In my view, just as all ducks have their season and the wary hunter carefully scans the air to determine which duck may and which may not be shot at a given time on a certain day, the same holds true for distinguishing between contract provisions that could in another context be deemed truly defensive measures demanding enhanced scrutiny by a court. When certain, or when in doubt that the "duck" is not in season, courts, like prudent waterfowlers, should defer.

I believe that the absence of a suggestion of self-interest or lack of care compels a court to defer to what is a business judgment that a court is not qualified to second guess. However, I recognize that another judge might prefer to view the reasonableness of the board's action through the *Unocal* prism before deferring.[121] Some flexible, readily discernable standard of review must be applied no matter what it may be called. Here, one deferring or one applying *Unocal* scrutiny would reach the same conclusion. When a board agrees rationally, in good faith, without conflict and with reasonable care to include provisions in a contract to preserve a deal in the absence of a better one, their business judgment should not be second-guessed in order to invalidate or declare unenforceable an otherwise valid merger agreement. The fact that majority stockholders free of conflicts have a choice and every incentive to get the best available deal and then make a rational judgment to do so as well neither unfairly impinges upon minority shareholder choice or the concept of a shareholder "democracy" nor has it any independent significance bearing on the reasonableness of the board's separate and distinct exercise of judgment.

I cannot follow the majority's reliance on *Paramount v. QVC.*[122] and *Paramount Communications v. Time.*[123] *QVC*, is controlled by the facts of the underlying transaction. The Paramount board did not canvass the market, negotiated exclusively with Viacom despite QVC's announced interest and refused to give QVC an opportunity to top the Viacom offer. Arguably, the Paramount board shunned QVC's higher offer and then turned to lock up a deal with Viacom less valuable to stockholders along with an unreasonable grant of a right to exercise a stock option of unlimit-

---

120. The majority refers to "defensive measures," "deal protection devices," "structural safety devices" and "defensive devices" as interchangeable, each demanding heightened scrutiny. "Of course, the mere fact that the court calls a 'duck' a 'duck' does not mean that such defense provisions will not be upheld so long as they are not draconian." *McMillan v. Intercargo*, 768 A.2d 492, 506 n. 62 (Del.Ch.2000).

121. There appears to be ample enough academic debate over the effectiveness and utility

of the analytical tool which should be employed. I do recognize that critics view the business judgment rule as no framework for analysis at all. That view presupposes that judges or regulators have an equal or greater expertise in exercising business judgments as in imposing social policy.

122. *Paramount Communications, Inc. v. QVC Network, Inc.,* 637 A.2d 34 (Del.1993).

123. *Paramount Communications, Inc. v. Time, Inc.,* 571 A.2d 1140 (Del.1989).

ed value. *QVC* does not, in my view, support a policy of decrying and then proscribing precommitment strategies generally on the supposition that in every fact situation they "disable" a board from an efficient breach.

*Paramount v. Time* discussed the "original" and the "revised" Time–Warner agreements. Both courts reviewing the "original" concluded that it resulted from an "exhaustive appraisal of Time's future as a corporation" and that the "Time board's decision" to enter into the original agreement (containing deal preservation provisions) with Warner "was entitled to the protection of the business judgment rule."[124] In my view, the strategic policy decision protected in the original Time–Warner agreement cannot, like the NCS–Genesis merger of necessity here, be considered a responsive "defensive measure" compelling a *Unocal* analysis. By contrast, both courts concluded that the "revised" agreement was "defense-motivated" and as a result *"Unocal* alone applies to determine whether the business judgment rule attaches."[125]

Lockup provisions attempt to assure parties that have lost business opportunities and incurred substantial costs that their deal will close. I am concerned that the majority decision will remove the certainty that adds value to any rational business plan. Perhaps transactions that include "force-the-vote" and voting agreement provisions that make approval a foregone conclusion will be the only deals invalidated prospectively. Even so, therein lies the problem. Instead of thoughtful, retrospective, restrained flexibility focused on the circumstances existing at the time of the decision, have we now moved to a bright line regulatory alternative?

For the majority to articulate and adopt an inflexible rule where a board has discharged both its fiduciary duty of loyalty and care in good faith seems a most unfortunate turn. Does the majority mean to signal a mandatory, bright line, *per se* efficient breach analysis *ex post* to all challenged merger agreements? Knowing the majority's general, genuine concern to do equity, I trust not. If so, our courts and the structure of our law that we have strived so hard to develop and perfect will prevent a board, responsible under Delaware law to make precisely the kind of decision made here, in good faith, free of self interest, after exercising scrupulous due care from honoring its contract obligations.

Therefore, I respectfully dissent.