IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 16, 2008 Session

# INDIANA STATE DISTRICT COUNCIL OF LABORERS and HOD CARRIERS PENSION FUND
v.
# GARY BRUKARDT, et al.

**Appeal from the Chancery Court of Davidson County**
**No. 05-1392, II, Carol McCoy, Chancellor**

————————————————

**No. M2007-02271-COA-R3-CV - Filed February 19, 2009**

————————————————

This is a shareholder class action which was dismissed by the trial court for failure to state a claim. The case alleges breach of fiduciary duty and self-dealing against members of the Board of Directors who procured and approved a merger. For the reasons stated herein, we hold that the complaint alleges sufficient facts to allow the case to go forward, and, therefore, dismissal was in error. The decision below is reversed and the case is remanded for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed.**

WALTER C. KURTZ, SR. J., delivered the opinion of the court, in which ANDY C. BENNETT, J., and RICHARD DINKINS, J. joined.

James G. Stranch, III, J. Gerard Stranch, IV, and Joe P. Leniski, Jr., Nashville, Tennessee; Darren J. Robbins, Randall J. Baron, A. Rick Atwood, Jr., and David T. Wissbroecker, San Diego, California; and William K. Cavanagh, Jr., Springfield, Illinois, for appellant.

Michael L. Dagley, Matthew M. Curley, Nashville, Tennessee;  Lawrence O. Kamin, and Derek M. Schoemann, New York, New York; for appellee Renal Care Group, Inc.

Ames Davis, Nashville, Tennessee, Mary C. Gill, Atlanta, Georgia, and  Mark T. Calloway, Charlotte, North Carolina, for individual appellees.

1

# OPINION

## I. Introduction and Background

This is a shareholder class action[1] filed against board members of Renal Care Group, Inc. (Renal Care) related to its 2005 merger with Fresenius Medical Care AG (Fresenius) alleging breach of fiduciary duty and self-dealing.[2] The trial court dismissed the amended complaint for failure to state a claim. Tenn. R. Civ. P. 12.02(6). Plaintiff appeals.

The merger was announced in May 2005. Several days later plaintiff filed its original complaint. Defendants then removed the case to federal court. The merger went forward. The stockholders ratified, and the merger closed in March 2006. In the meantime, the federal court remanded this case back to state court, but nothing transpired until September 13, 2006, when plaintiff filed the amended complaint which is the subject of this appeal.

On December 22, 2006, defendants moved to dismiss the amended complaint. The motion was granted August 30, 2007.

According to the complaint, the defendants sought the merger in order to cover alleged Medicare fraud and back dating of stock options but also to insure that they would be free of any possible liability for such acts. It is then alleged that the defendants, employed investment bankers who were themselves conflicted, did not freely market the company, imposed improper deal protection devices, and then sold the merger to their shareholders by failing to disclose the very problems that motivated the merger.

The appellees moved to dismiss. In support of their motion they filed:
1. Proxy statement;
2. Certificate of Incorporation of Renal Care Group, Inc.; and
3. News releases and news articles related to the merger and the affirmative results of the merger.

---

[1] Derivative claims were also alleged. They have been dismissed, and appellant has not appealed the dismissal of those claims. The distinction between a derivative claim and a direct shareholder action have on occasion not been clearly defined. *See Tooley v. Donaldson, Lufkin, and Jenretta*, 845 A.2d 1031 (Del. 2004). That issue, however, has not been raised in this case.

[2] The defendants sued were Gary Burkhardt, President, CEO and Board Member, William Johnson, Chairman and Board Member, Harry Jacobson, Joseph Hatts, William Lapham, Thomas Lowery, Stephen McMurry, Peter Grun, and Thomas Smith. Also sued was Ronald Hines, Vice President and CFO, Raymond Hakin, another Vice President, and Dirk Allison, a former Vice President and CFO.

The motion was heard on August 16, 2007, and at the close of the hearing, the chancellor ruled orally that the record showed that the Board did not lack sufficient independence; the Board had appropriately relied on two (2) financial advisors; and there was no way the Board could have assessed a value to the stock options issue and Medicare fraud issue at the time of the merger, as those potential claims had not matured at the time of the merger. She then asked defense counsel to draw an order which "adopts the facts set out in the Memorandum of Law in support of the Motion to Dismiss as submitted by the defendants." The result was a 33-page lawyer-drawn order (with 34 footnotes) dismissing the complaint. The order entered on August 30, 2007, is considerably broader than the oral ruling.

Appellants' counsel takes umbrage at the findings in this lengthy order and the process by which the order was generated.[3] Ultimately this issue is not relevant as this Court reviews the dismissal *de novo*.

The amended complaint is 61 pages long and on occasion suffers from editorial and redundant inclusions. Its introduction summary, although itself lengthy, is set out below, as the allegations in the complaint are obviously at the heart of this appeal.

Summary of the Action

1. This is a stockholder class action brought by plaintiff on behalf of the former holders of Renal Care common stock. It is also a derivative action brought on behalf of Renal Care for the *pro rata* benefit of those former shareholders. The action is brought against certain former officers and directors of Renal Care, and arises out of their unlawful actions in connection with the sale of Renal Care to Fresenius in a cash-out merger (the "Acquisition"), as well as in connection with defendants' improper backdating and/or timing of insider stock options over a number of years. All told, defendants' misconduct caused hundreds of millions of dollars in damages to the Class and the Company.

2. Several things happened in late 2004 that spurred defendants, within a matter of days, to seek out the Acquisition with Fresenius. First, on October 26, 2004, defendants announced that the

_____

[3] This Court and our Supreme Court have expressed a preference for judgments prepared by the "independent labor of the judge" in cases involving the need for detailed factual findings and/or complex legal analysis. *Delevan-Delta Corp. v. Roberts*, 611 S.W.2d 51, 52-53 (Tenn. 1981); *Goolsby v. Upper Cumberland Oil*, 34 S.W.3d 309, 313 (Tenn. Ct. App. 2000). Lawyer written orders are not prohibited, however, as the appellate court relies on the fact that the trial judge has "carefully examine[d] them [and] establishe[d] that [the order] accurately reflects her views and conclusions, and not those of counsel." *Delevan-Delta*, 611 S.W.2d at 53.

3

Company had been subpoenaed by the Department of Justice ("DOJ") in connection with a Medicare fraud investigation into, among other things, questionable billing practices regarding certain tests and therapies that were administered to patients and then billed to Medicare. This subpoena was of serious concern to defendants because they had, over the years, caused the Company to charge Medicare nearly 40% more for those tests and treatments than defendants' true costs. Thus, defendants were facing untold millions of dollars in civil and criminal fines and penalties.

3. Second, in November 2004, the Securities and Exchange Commission ("SEC") launched an investigation into stock option pricing practices at various companies, including, among others, Analog Devices, Inc. ("Analog Devices"). Analog Devices disclosed this investigation in a November 30, 2004, 10-K filing with the SEC, which was picked up and reported by the financial press. The Analog Devices 10-K stated:

> We have received notice that the SEC is conducting an inquiry into our granting of stock options over the last five years to officers and directors. We believe that other companies have received similar inquiries. Each year, we grant stock options to a broad base of employees (including officers and directors) and in some years those grants have occurred shortly before our issuance of favorable annual financial results. The SEC has requested information regarding our stock option grants, and we intend to cooperate with the SEC. We are unable to predict the outcome of the inquiry.

4. This announcement, on the heels of the DOJ subpoenas, sent another shockwave through defendants because, from 1996 until 2003, defendants had repeatedly engaged in the improper practice of backdating stock options to the dates of quarterly and/or annual lows in the Company's stock price, and/or had timed stock grants to coincide with, and take advantage of, the release of positive news (and the corresponding lift that news had on the Company's stock). By doing so, defendants were able to ensure tens of millions of dollars in stock option profits for themselves and/or other Company insiders, while at the same time causing tens of millions of dollars in harm to the Company.

4

5.    Defendants were able to allay shareholder suspicion regarding their improper options pricing activity by filing with the SEC, as exhibits to quarterly or annual reports, option grant agreements, many of which were misdated, which gave the illusion of legitimacy to the option grants.  Indeed, it was not until the *Wall Street Journal* published an article in May 2006 exposing defendants' options misconduct that Renal Care's former shareholders learned what had really been going on.  According to the *Wall Street Journal's* statistical analysis, the odds are 100 million to one against the timing of defendants' stock option grants being mere coincidence.

6.    Third, on December 2, 2004, the DOJ confirmed that Gambro Healthcare ("Gambro") would pay more than $350 million in criminal fines and civil penalties to settle allegations of fraud against government healthcare programs, including kickbacks paid to physicians, false statements made to procure payment for unnecessary tests and services, and payments made to a sham equipment company.  This too was of great concern to defendants because, for years, they had caused the Company to engage in business relationships with physicians and medical groups (including some run by defendants themselves) that failed to meet anti-kickback and fair market value safe harbor requirements.  The investigation of Gambro, which soon spread to include defendants and the Company, also threatened to expose defendants to untold millions of dollars in civil and criminal fines and penalties.

7.    The announcement of the DOJ and SEC investigations, as well as the massive settlement Gambro had just agreed to pay, signaled to defendants that the jig was up, as their misconduct was bound to come to light, and soon.  The problem then became: what was the best strategy for defendants to try to escape liability to the Company and its shareholders for their breaches of fiduciary duty?  Defendants quickly arrived at an answer: a merger, which (hopefully) would discourage any derivative suits and simultaneously provide for a much deeper pocket to indemnify defendants against not only shareholder litigation but any governmental action that might be taken.

8.    Thus, only five days after the DOJ announced its $350 million settlement with Gambro, only nine days after Applied Digital announced that it was one of a number of companies being targeted

by the SEC for options mispricing, and barely six weeks after the October 2004 DOJ subpoena was handed down, merger discussions had already begun in earnest between defendants and Fresenius. And rather than shopping around for a higher bidder that might be less accommodating to them, defendants pressed forward with plans to sell the Company to - and obtain indemnity from - Fresenius.

9. For its part, Fresenius was getting such a good deal for Renal Care that it was not only willing to divest itself of various assets at fire sale prices to obtain antitrust clearance for the Acquisition, it was also willing to contractually indemnify defendants for the liability their various improper actions had subjected them to. As defendant Gary Brukardt ("Brukardt"), the Company's then-Chief Executive Officer ("CEO"), would later delicately put it, when asked about yet another DOJ subpoena to the Company: "When we structured our transaction with Fresenius Medical Care, the possibility of such a subpoena was expressly contemplated by the provisions of the merger agreement."

10. Given the liability that the members of the Company's Board of Directors ("Board") faced, as detailed herein, those members were clearly conflicted with regard to their decision to pursue the Acquisition. Indeed, defendants were no strangers to conflicts of interest, as their years of improper related-party transactions and improper stock option grants demonstrate. Thus, it is not surprising that, given their resolve to get a merger done, they willfully ignored still more conflicts of interest that arose in connection with the Acquisition, both on the part of the Company insiders who were "negotiating" the Acquisition and the investment advisors who were counseling them in connection therewith.

11. For example, Board members were aware that Fresenius was seeking to employ both Brukardt and defendant William P. Johnston ("Johnston"), the Chairman of the Company's Board, following completion of the Acquisition. Yet defendants not only failed to form a special committee (assuming they could find any independent Board members) to negotiate and oversee the process by which the Acquisition was conducted, the Board completely abdicated the Acquisition process to Brukardt and Johnston, who then (with the other defendants' knowledge) simultaneously negotiated both the Acquisition terms with Fresenius, their soon-

6

to-be employer, and the terms of their post-Acquisition employment agreements. It is no surprise, then, given these numerous conflicts of interest and abdications of fiduciary duty, that Brukardt and Johnston simultaneously negotiated deals that benefitted themselves and their future employer and were unfair to the Company and its shareholders.

12. The Board's investment advisors also were conflicted in connection with the Acquisition. For example, not only did these advisors receive fees that were contingent on the closing of the Acquisition (thus motivating them to opine that the Acquisition was "fair" so that they could get paid million of dollars on the deal), but one of those advisors, Banc of America Securities, LLC ("Banc of America"), also agreed to provide financing to Fresinius in connection with the Acquisition. Thus Banc of America essentially represented both sides in the Acquisition, and was motivated to favor Fresenius in that representation to reduce its bad debt exposure (by ensuring Fresenius paid less than full and fair value for Renal Care).

13. To further ensure the success of the Acquisition, the Board locked up the Acquisition by agreeing to various "deal-protection" devices such as: (I) a $96.25 million termination fee; (ii) a no solicitation/no shop agreement; and (iii) a matching rights provision to ensure that Fresenius, and only Fresenius, would acquire the Company.

14. Moreover, to coerce the Company's public shareholders into approving the Acquisition, thus (hopefully) evading personal liability for their breaches of fiduciary duty, defendants caused the Company, on July 21, 2005, to file with the SEC and disseminate to the Company's public shareholders the Definitive Proxy Statement concerning the Acquisition ("the Proxy"), which misstated and/or omitted material information regarding the Acquisition that was essential to the Company's former public shareholders' ability to cast a fully-informed vote on the Acquisition. The Proxy's misstatements and omissions include: (I) information regarding defendants' and their advisors' conflicts of interest in the Acquisition; (ii) the reasons why the Board did not appoint a special committee to evaluate the fairness of the Acquisition; (iii) the undisclosed options pricing claims, which were assets of the Company worth tens of millions of dollars, but which the shareholders were not compensated for in the

Acquisition; (iv) the forecasts and projections prepared by Renal Care's management for fiscal years 2005 through 2008; (v) the estimates of transaction synergies created by the Acquisition; and (vi) the basis for and data underlying the analyses performed by Morgan Stanley & Company, Inc. ("Morgan Stanley"), the Board's other financial advisor, in its fairness opinion. By concealing material information from shareholders for the purpose of avoiding personal liability, defendants committed fraud in the merger. Thus, any continuous ownership requirement to assert derivative claims on behalf of the Company that might otherwise apply is nullified.

15. In sum, in pursuing the unlawful plan to sell Renal Care, the Board members violated applicable law by directly breaching and/or aiding and abetting the other defendants' breaches of their fiduciary duties of loyalty, due care, candor, independence, good faith and fair dealing that were owed to the Company's shareholders. And by participating in and/or permitting the options mispricing, each of the defendants' breaches of their fiduciary duties of loyalty, due care, candor, independence, good faith and fair dealing that were owed to the Company.

16. In essence, the Acquisition was the product of a hopelessly flawed process that was designed to ensure the sale of Renal Care to Fresenius, while allowing defendants to obtain continued employment with the surviving corporation for themselves, and/or substantial change of control benefits, and/or indemnification for their prior misconduct - all to the detriment of Renal Care and its former public shareholders. Thus, the Company and its shareholders have been damaged.

## II.  MOTION TO DISMISS AND STANDARD OF REVIEW

The standard of review and the rules governing consideration of a Tenn. R. Civ. P. 12.02(6) motion have been repeated may times:

A Rule 12.02(6) motion to dismiss admits the truth of all of the relevant and material averments contained in the complaint, but it asserts that the averments nevertheless fail to establish a cause of action. *See, e.g., Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716 (Tenn. 1997). Therefore, when reviewing a dismissal of a complaint under Rule 12.02(6), this Court must take the factual allegations contained in the complaint as true and review the trial court's legal conclusions *de novo* without giving any presumption of correctness

8

to those conclusions. *See, e.g., Doe v. Sundquist*, 2 S.W.3d 919, 922 (Tenn. 1999). Because a motion to dismiss a complaint under Tennessee Rule of Civil Procedure 12.02(6) challenges only the legal sufficiency of the complaint, courts should not dismiss a complaint for failure to state a claim based upon the perceived strength of a plaintiff's proof. *See, e.g., Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, 986 S.W.2d 550, 554 (Tenn. 1999). As Rule of Civil Procedure 8.01 only requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief," courts should liberally construe the complaint in favor of the plaintiff when considering a motion to dismiss for failure to state a claim. *See, e.g., Pursell v. First Am. Nat. Bank*, 937 S.W.2d 838, 840 (Tenn. 1996). Although the allegations of pure legal conclusions will not sustain a complaint, *see Ruth v. Ruth*, 213 Tenn. 82, 372 S.W.2d 285, 287 (1963), courts should grant a motion to dismiss only when it appears that a plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief, *see, e.g., Cook v. Spinnaker's of Rivergate, Inc.,* 878 S.W.2d 934, 938 (Tenn. 1994).

\* \* \* \*

A complaint "need not contain in minute detail the facts that give rise to the claim," so long as the complaint does "contain allegations from which an inference may fairly be drawn that evidence on these material points will be introduced at trial." *Donaldson v. Donaldson*, 557 S.W.2d 60, 61 (Tenn. 1977).

*White v. Revco Discount Drug Centers*, 33 S.W.3d 713, 718, 725 (Tenn. 2000). *Accord, Givens v. Mullikin ex rel McElwaney,* 75 S.W.3d 383, 391, 399, 403-404 (Tenn. 2002); *Kersey v. Bratcher*, 253 S.W.3d 625, 628 (Tenn. Ct. App. 2007). Not only are the factual assertions presumed true, but the plaintiff is to be given the benefit of all reasonable inferences. *Trau-Med of America v. Allstate*, 71 S.W.3d 691, 696 (Tenn. 2002). *See, generally*, Pivnick, *Tennessee Circuit Court Practice* § 11.3 (2008 ed.). Furthermore, matters outside the pleadings generally should not be considered in deciding whether to grant the motion. *Trau-Med,* 71 S.W.3d at 696.

The reliance on an affirmative defense in granting a motion to dismiss is very seldom sustainable.

[W]e are hesitant to dismiss her complaint based upon the potential existence of a factual affirmative defense. In *Anthony v. Tidwell*, 5670 S.W.2d 908, 909 (Tenn. 1977), we held that a "complaint is subject to dismissal under rule 12.02(6) for failure to state a claim if an affirmative defense clearly and unequivocally

9

appears on the face of the complaint." We also noted that "[i]t is not necessary for the defendant to submit evidence in support of his motion when the facts on which he relies to defeat plaintiff's claim are admitted by the plaintiff in his complaint." Therefore, when the affirmative defense involves only an issue of law, such as whether the statute of limitations has run, *see Tidwell*, 560 S.W.2d at 909; *Dukes v. Noe*, 856 S.W.2d 403, 404 & n.1 (Tenn. Ct. App. 1993), application of this standard is certainly appropriate.

Nevertheless, when the affirmative defense relates primarily to an issue of fact, different concerns may often counsel against deciding the merits of the affirmative defense in a motion to dismiss. First, the liberal pleading requirements of Rule of Civil Procedure 8.01 require a plaintiff only to set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." *See White,* 33 S.W.3d at 718. As one commentator has noted, the very purpose of Rule 8.01 is defeated if a plaintiff must plead facts not strictly related to the prima facie claim solely "to anticipate matters that may be set up as affirmative defenses." *See* Rhynette Northcross Hurd, *The Propriety of Permitting Affirmative Defenses to be Raised by Motions to Dismiss*, 20 Univ. Mem. L.Rev. 411, 415 (1990). Second, and more importantly, a court resolving a factual dispute only upon the complaint's allegations may not fully consider whether other evidence exists that defeats or mitigates the defense. Consequently, an injustice may occur if a court dismisses a complaint on a factual affirmative defense merely because no rebuttal of that defense appears within the complaint's allegations. *Id.*

*Givens*, 75 S.W.3d at 404.

It is of import that a motion to dismiss is not converted to a summary judgment motion. The motion to dismiss for failure to state a claim is just that, while a summary judgment motion goes beyond the "allegations of the complaint" to the "merits of the litigation." *Brick Church Transmission v. Southern Pilot*, 140 S.W.3d 324, 328 (Tenn. Ct. App. 2003). If converted, then the nonmoving party is "entitled to submit affidavits in opposition to the Motion and to make further discovery if such is necessary." *Id.* at 329. The general attitude toward these motions was expressed by Judge [now Justice] Koch when he observed that "[T]hese motions are not favored [citation omitted] and are now rarely granted in light of the liberal pleading standards in the Tennessee Rules of Civil Procedure." *Dobbs v. Guenther*, 846 S.W.2d 270, 273 (Tenn. Ct. App. 1992).

The appellees have addressed the movement in the federal system away from the above Tenn. R. Civ. P. 12.02(6) standards and for the adoption of a stricter standard applicable to the validity of a complaint. See *Bell Atlantic Corp. v. Twombly,* ____ U.S. _____, 127 S.Ct. 1955 (2007). *See,*

*generally*, Blumstein, *A Higher Standard, Twombly Requires More for Notice Pleading*, 43 T.B.J. 12 (Aug. 2007). While there are valid arguments in favor of this standard, it has not been adopted in Tennessee, and this Court is not in a position to adopt the stricter *Twombly* standard.

## III. STATEMENT OF ISSUES

The appellant states the issues as follows:

1.      Whether the trial court erred by adopting defendant's view of the factual allegations in the Complaint.

2.      Whether the trial court erred by making extrajudicial findings of fact.

3.      Whether the trial court erred by taking judicial notice of hearsay documents and treating them for the truth of the matter asserted.

4.      Whether the Complaint adequately alleges that defendants breached their fiduciary duties in connection with the sale of Renal Care to Fresenius.

5.      Whether the trial court erred in applying the affirmative defense of shareholder ratification at the pleading stage.

6.      Whether the trial court erred in applying the alleged exculpatory provision in Renal Care's Certificate of Incorporation to bar plaintiff's well-pleaded allegations of breaches of fiduciary duties of loyalty and good faith, by defendants.

The appellee, of course, proponents of good advocacy, reverse the issues by stating them in the affirmative, but they do not differ from the above.

1.      Did the trial court apply the correct legal standards in rejecting certain inferences and unsupported legal conclusions advanced by Plaintiff and by considering only well-pled allegations and certain publicly-available materials in dismissing the Amended Complaint?

2.      Did the trial court correctly hold that the Complaint failed to state a claim for breach of the duty of loyalty where the only alleged interests of a majority of directors approving

the transaction were that they were to receive essentially duplicative indemnification rights from the acquirer, and that they did not attempt to value derivative claims which had not been asserted and did not even exist at the time of the merger?

3.  Did the trial court correctly hold that the Complaint failed to state a claim for breach of the duty of care where the Defendants obtained a record price for the shareholders, but where they negotiated with a single strategic buyer, agreed to certain standard deal-protection devices, and relied on the advice of two respected financial advisors who, as is typical in such situations, had fully-disclosed interests in seeing the transaction completed?

4.  Did the trial court correctly hold that the Complaint failed to allege any material misstatements or omissions in the proxy that caused harm to shareholders and for which damages are an appropriate remedy?

5.  Did the trial court correctly hold that Plaintiff's duty of loyalty and care claims are barred by the doctrine of shareholder ratification where Plaintiff failed to demonstrate that the near-unanimous shareholder vote approving the merger was anything less than fully-informed?

6.  Did the trial court correctly hold that Plaintiff's duty of care and disclosure claims are barred by the exculpatory provision in Renal Care's Certificate of Incorporation where Plaintiff failed to adequately allege a breach of loyalty or good faith?

## IV.  PROCEDURAL ISSUES BELOW

The appellant asserts that it was error for the Chancellor to rely on her personal experience with proxy statements and that this reference somehow taints the validity of the proceedings in the trial court.  The Court agrees with the appellee that this is a nonissue.  The Court cannot read the Chancellor's comments as the appellant suggests.  Her remarks simply related to the fact that she read the disclosures and had some personal experience in reading proxy statements.

12

The motion to dismiss was never converted to a summary judgment (*See* Tenn. R. Civ. P. 12.02), and yet the Chancellor did consider materials beyond what was contained in the complaint. This Court has already made reference to the general rule that matters outside the pleadings should not be considered on a motion to dismiss for failure to state a claim. *Trau-Med* 71 S.W.3d at 696. *See also International Merchant Services v. ATM Central*, 2004 WL 170392 (Tenn. Ct. App. Jan. 27, 2004) (trial court reversed when it considered evidence outside the complaint in granting motion to dismiss for failure to state a claim).

There are exceptions to the above rule, and the appellee contends that these exceptions apply here. The exceptions are reflected as follows:

> Numerous cases, as the note below reflects, have allowed consideration of matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned; these items may be considered by the district judge without converting the motion into one for summary judgment.

Wright and Miller, *Federal Practice and Procedure, Civil* § 1357, p. 376 (3d ed. 2004). The above, as noted, is reflected in numerous court decisions and is well recognized. *See, e.g.*, *Wyser-Pratte Management Inc. v. Telxon Corp.*, 413 F.3d 553, 560 (6th Cir. 2005) ("In addition to allegations in the complaint, the court may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for taking judicial notice"); *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000) (court may consider SEC disclosure documents without converting motion to dismiss to summary judgment).

The appellant contends the proxy statement should not have been considered, and the certificate of incorporation should not have been considered. Given the authorities cited above, the Court disagrees and finds these materials properly considered. Tennessee law allows for judicial notice (TRE 201) of public records. Cohen, Shepard, and Paine, *Tennessee Law of Evidence* § 2.01[4][c] (5th ed. 2005). Obviously the proxy statement is to only be considered for what it says, not for the truth of the information in the statement.

The appellant, however, is correct in its assertion that the trial court should not have considered newspaper articles and press releases. The trial court's order states that she relied on these materials, and it was these materials that brought before the trial court information such as: the shareholders voted "overwhelmingly" for the merger; the price was competitive in comparison to a recent merger; the sales price was a 39.5% premium over the average market closing over the prior year; and the sales price was extremely attractive. None of the facts cited above, many of which were central to the dismissal, can be found in the complaint.[4] These self-

_____

[4] They are contained in defendant's exhibits in support of its motion, numbers 5-13,

13

generated press releases and other news articles are not subject to judicial notice under Tenn. R. Evid. 201, nor are they otherwise admissible for the truth of the matter asserted. Tenn. R. Evid. 802. They should not have been considered. The error allowing consideration of these materials was of some import in the erroneous granting of the motion to dismiss.

## V. DECISION

The appellees are correct in asserting that the legal probabilities favor them, but legal probabilities unattached to facts do not equate to the granting of a motion to dismiss.

Take for instance the allegation related to the use of deal protection measures. Deal protection measures are often found to be proper when a board of directors uses them to insure that they elicit the highest offer from the bidder confident that its efforts will not be thwarted by a marginally more attractive bid. *Omnicare, Inc. v. NCS Healthcare Inc.*, 818 A.2d 914 (Del. 2003)[5]. However, Delaware law does not bestow unbridled discretion to consent to deal protection measures in derogation of the fiduciary duty toward the shareholder. *Omnicare, Inc.* makes clear that if judging the reasonableness of deal protecting measures, the court must engage in a fact intensive inquiry and consider the factors considered by the Board. *Omnicare, Inc.*, 818 A.2d at 930-934. Here no such factual inquiry was made.

The appellees also assert that the contention regarding the back-dated stock options and/or the investigation for Medicare fraud were not yet mature, and, as such, were so contingent as to not be an issue in the transaction. Here again, however, the Court is confronted only by facts alleged in the complaint.

There are occasions when potential derivative claims must be valued and therefore disclosed in the merger process. "Delaware law imposes upon a board of directors the fiduciary duty to disclose fully and fairly all material facts within its control that would have significant impact on a stockholder vote." *Stroud v. Grace*, 606 A.2d 75, 85 (Del. 1992). A fact is material if there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote. *Rosenblatt v. Getty Oil*, 493 A.2d 929, 944 (Del. 1985).

Allegations of Medicare fraud speak for themselves. (*See infra* page 4, ¶ 2) The backdating of stock options has been described as follows:

> [T]his practice involves a company issuing stock options to
> an executive on one date while providing fraudulent

---

[5] The parties agree that Delaware substantive law applies. Furthermore, this Court has cited to several Delaware Chancery Court decisions. The Delaware Chancery Court is recognized as the "preeminent business court in the nation" and "is the primary forum for corporate governance litigation in the United States." Balotti and DiComillo, *Corporate and Commercial Practice in the Delaware Court of Chancery* 54 Bus. Law 757 (Feb. 1999).

documentation asserting that the options were actually issued earlier. These options may provide a windfall for executives because the falsely dated stock option grants often coincide with the market lows. Such timing reduces the strike prices and inflates the value of stock options, thereby increasing management compensation. This practice allegedly violates any stock option plan that requires strike prices to be no less than the fair market value on the date on which the option is granted by the board. Further, this practice runs afoul of many state and federal common and statutory laws that prohibit dissemination of false and misleading information.

*Ryan v. Gifford*, 918 A.2d 341, 345 (Del. Ch. 2007). The consequences:

A director who approves the backdating of options faces at the very *least* a substantial likelihood of liability, if only because it is difficult to conceive of a context in which a director may simultaneously lie to his shareholders (regarding his violations of a shareholder-approved plan, no less) and yet satisfy his duty of loyalty. Backdating options qualifies as one of those "rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." Plaintiff alleges that three members of a board *approved* backdated options, and another board member accepted them. These are sufficient allegations to raise a reason to doubt the disinterestedness of the current board and to suggest that they are incapable of impartially considering demand.

\*      \*      \*      \*

To make matters worse, the directors allegedly failed to disclose this conduct to their shareholders, instead making false representations regarding the option dates in many of their public disclosures.

I am unable to fathom a situation where the deliberate violation of a shareholder approved stock option plan and false disclosures, obviously intended to mislead shareholders into thinking that the directors complied honestly with the shareholder-approved option plan, is anything but an act of bad faith. It certainly cannot be said to amount to faithful and devoted conduct of a loyal fiduciary.

15

*Ryan*, 918 A.2d at 355-356, 358.[6]

The complaint alleges facts (*see, infra,* pages 4-5, ¶ 3-5) which assert the backdating issue and its potential impact.   This in turn precludes the possibility of finding that disclosure was not "material" based on the facts alleged in the complaint.

The discussion above may admittedly be putting the cart before the horse.  What the complaint asserts is that the directors sought merger for an improper purpose, and, therefore, they breached their fiduciary duties of "loyalty," "due care," and "good faith," and this in turn was to the detriment of the shareholders.[7]  The issues already addressed were but two of the factual allegations related to the mechanism of the sale.

The trial court simply swept away the entire lawsuit by determining that not only were some of the affirmative claims factually unsupported but also that other assertions were barred by defenses.

The trial court ruled that the case was barred by shareholder ratification. This defense, however, is based on the vote of fully informed stockholders.  *Yiannatsis v. Stephanis*, 653 A.2d 275, 280 (Del. 1995).  Thus, the plaintiff's case is caught by circular reasoning.  If everything was in the proxy statement, then the ratification should have trumped the lawsuit.  However, if there are factual issues regarding disclosure, then ratification cannot be sustained as a defense. The Court is of the opinion that the allegations in the complaint regarding non-disclosure are still appropriately unresolved at the motion to dismiss stage, so this defense must be rejected as a ground for granting a motion to dismiss.

Although the appellees did not brief the issue before this Court, the trial judge held on the issue of disclosure that "[T]he original complaint's allegations were described in some detail in the Proxy."  In fact, the 61-page Proxy contains this description on page 36:

> The complaints allege that Renal Care Group and its directors engaged in self-dealing and breached their fiduciary duties to the Renal Care Group shareholders in connection with the merger agreement because, among other things, Renal Care Group used a flawed process, the existence of the previously disclosed subpoena from the Department of Justice, the lack of independence

---

[6] Potential criminal liability for backdating stock options is discussed at *Ryan*, 981 A.2d at 356 n.38.

[7] Scores of cases address the duty of board members in a merger and the obligation of the courts to provide oversight.  The lexicon seems to be referenced as "Revlon duties" from the discussion of board obligations in seeking or considering a merger in *Revlon v. MacAndrews & Forbes*, 506 A.2d 173 (Del. 1986).

16

of one of Renal Care Group's financial advisors and the existence of Renal Care Group's supplemental executive retirement plan. Renal Care Group believes that the allegations in the complaints are without merit. Completion of the merger is subject to customary conditions, including the absence of any order or injunction prohibiting the closing. The complaints seek to enjoin and prevent the parties from completing the merger.

This cannot be deemed to be a "detailed" narration of the allegations in the complaint, nor does it preclude material disclosures as an issue.

Delaware law provides a shelter for corporate board members at Del. Corp. Code § 102(b)(7), which was adopted by Renal Care in its Certificate of Incorporation:

No person shall be personally liable to the Corporation or its shareholders for monetary damages for breach of fiduciary duty as a director; provided, however, that the foregoing shall not eliminate or limit the liability of a director (I) for any breach of the director's duty of loyalty to the Corporation or its shareholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, (iii) under Section 147 of Delaware General corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit.

The allegations in the complaint, as filtered through Tennessee motion to dismiss case law, cannot be barred at this stage by Del. Corp. Code § 102(b)(7). The complaint sufficiently alleged bad faith and other conduct by the directors that would take them outside the protection of the statute.

The trial court held that a majority of the Board voting on the merger had no conflicts of individual interests and, therefore, the vote cannot be impeached by self interest. *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002) (board action is valid if majority is disinterested). The complaint, however, alleges facts inconsistent with the resolution of this issue by the trial court at the motion to dismiss stage. It is alleged that defendants, Brukhardt, Hutts, Lapham, McMurray, Jacobson, Hinds, Hakim and Allison were all particularly exposed to backdating liability because they either received backdated stock options or sat on compensation committees that granted them.

Appellants contend that by engineering the merger which included indemnification, all defendants were able to significantly minimize their exposure to liability in connection with the alleged brewing problems at Renal Carre. As a result of the Acquisition, defendants secured indemnification for prior misconduct "to the fullest extent permitted by law" "until expiration of

the applicable statute of limitations with respect to any such claims against [defendants] arising out of such acts or omissions." Because of the potential liability defendants faced, this indemnification provision was a benefit procured by all defendants not disclosed to Renal Care's public shareholders.

The trial court concluded that the alleged indemnification benefit was not material because it essentially extended existing agreements defendants had with Renal Care. This conclusion is inconsistent with the observation in *Louisiana Mun. Police Employee's Ret. Sys. v. Crawford*. 918 A.2d 1172, 1180 n.8 (Del. Ch. 2007). First as a matter of Delaware law, Renal Care could only indemnify defendants for "acts in good faith and in the best interests of the corporation." But Fresenius, as a third party indemnifying Renal Care directors, is not bound by "the restrictions of statutory corporate law" and can extend indemnifications to defendants for breaches of the duty of loyalty and good faith. In other words, the indemnification offered by Fresenius covers defendants' liability for option backdating, a breach of the duty of good faith, whereas the indemnification offered to defendants by Renal Care could not. The *Crawford* court describes this distinction as "quietly critical." Thus, the plaintiffs contend, that only by securing indemnification from Fresenius via the acquisition could defendants be assured of coverage for their option backdating misconduct. *Crawford*, 918 A.2d at 1180 n.8.

Second, and of importance for directors who issued but did not receive backdated and/or improperly timed options, the expanded indemnification offered by Fresenius for disloyal and bad faith breaches of fiduciary duty protects against "considerable personal loss" where defendants have received "no corresponding benefit" in the form of backdated and/or improperly timed stock options. Put differently, any defendants who did not receive the benefit of backdated and/or improperly timed options will have nothing to offset their liability: "[s]uch directors may face considerable personal loss if found liable, making indemnification that much more important to them." *Id*.[8]

The appellees rely on *In re Sea-Land Corp. Shareholders,* 642 A.2d 792, 804-805 (Del. 1993), *summary aff'd* 633 A.2d 371 (Del. 1993), for the proposition that indemnification does not taint the merger process. *Sea-Land*, however, involved indemnification which was only equal to or not materially greater than what was already provided. 642 A.2d at 804-805.

Still another reason for the granting of the dismissal was the finding by the Chancellor that "plaintiff has not demonstrated that any of the alleged breaches of fiduciary duty, even if true, caused any qualified harm to the shareholders." The use of the word "demonstrated" is unfortunate, as it indicates an obligation on the pleader beyond the requirements of Tenn. R. Civ. P. 8.01.

---

[8] Appellees make light of this holding, as it was in a footnote. The Court observed that most all the decisions written by the Delaware Chancellors make use of numerous and lengthy footnotes, and it appears to be part of their culture of decision writing.

A plaintiff is not required "to prove damages at the pleading stage as an element of the prima facie case for breach of fiduciary duty of disclosure." *In re Tri-Star Pictures, Inc.*, 634 A.2d 319, 334 (Del. 1993). Furthermore, plaintiff has alleged that the disclosure violations negatively impacted the shareholders' economic interests. The Court is of the opinion that the detailed allegations, which include economic impact on the stockholders, are sufficient to survive the motion to dismiss.

It is not this Court's intent to write a tome on Delaware corporation law. Nor is it the intent of this Court to address all the potential claims raised in the complaint and dismissed by the trial court. The opinion in this case does, however, directly address the propriety of the granting of the motion to dismiss on this record. The issues addressed above merely illustrate the error of deciding to dismiss without the development of a full factual record. Here the trial court strayed from the principle that it must take well-pleaded material factual allegations as true, and the complaint must be liberally construed in the plaintiff's favor.

Illustrative of the approach to be taken is the decision of the Vice Chancellor in *Ryan v. Lentil Chemical,* 2008 WL 2923427 (Del. Ch. July 29, 2008), review granted by Delaware Supreme Court, 2008 WL 4294938 (Del. September 15, 2008). *Ryan* involved a post merger challenge by stockholders alleging they were negatively impacted by the merger. They challenged the merger for conflicts on the board, failure to use reasonable efforts to obtain the highest price, use of deal protective measures, and failure to disclose all material facts. The defendants moved for summary judgment.

The Vice Chancellor first observed that the pay out of $48 per share appeared "very attractive," but there were issues beneath the surface and when one "scratches the patina" of the merger "a troubling board process emerges." *Ryan*, 2008 WL 2923427, at *1. That troubling board process ultimately led the Vice Chancellor to conclude that the case should go forward on the "Revlon" claims, and the "deal protection" claims. The case is instructive on a number of substantive issues related to the causes of action in this case, but this Court rather focuses on the process as related to the dismissal of the claims below.

Whatever the ultimate outcome in *Ryan,* that court could only evaluate the substantive merits of the pled claims when it "scratch[ed] the patina" of the merger. A motion to dismiss does not scratch below the surface, and this Court is of the opinion that the allegations in the complaint were of sufficient specificity to allow the case to further proceed.

This case is reversed and remanded to the trial court for further proceedings as she may direct consistent with the Tennessee Rules of Civil Procedure. It may well be that many (if not all) of the issues may be capable of resolution on summary judgment. This opinion should in no way be interpreted as validating the appellant's claims. This opinion merely holds that the granting of a motion to dismiss was in error given the allegations in the complaint.

## CONCLUSION

For the reasons set forth above, the decision of the Chancery Court is reversed, and this case is remanded for further proceedings consistent with this opinion.  Costs are taxed to the appellees.

_____
Walter C. Kurtz, Senior Judge